John V. GALDIERI, et al., Plaintiff,

v.

The MONSANTO COMPANY, Defendant.

No. 00–CV–1113.

United States District Court, E.D. Pennsylvania.

May 7, 2002.

Thomas H. Dinkelacker, Dimmich, Guldin, Dinkelacker & Brienza, P.C., Jeffrey R. Dimmich, Dimmich, Guldin, Inkelacker & Brienza, Orefield, PA, for Plaintiff.

Kenneth D. Kleinman, Stevens & Lee, Wayne, PA, Mark H. Levison, Karen Nelson, Doepken Keevican & Weiss PC, St. Louis, MO, Joseph D. Shelby, Stevens & Lee, Lancaster, PA, for Defendants.

## *MEMORANDUM AND ORDER*

SCHILLER, District Judge.

### I. INTRODUCTION

Plaintiffs John V. Galdieri, David S. Hoover, and Nancy C. Wetherington, as executrix for the estate of Joseph B. Wetherington, bring this action against defendant Monsanto Company. Galdieri, Hoover, and Wetherington (collectively, "the Plaintiffs") are all former employees of Monsanto who were terminated without cause in 1998. They have brought this suit claiming that Monsanto breached their employment agreements requiring the implementation of a long-term incentive compensation plan. They also claim that Monsanto wrongfully failed to remove restrictions on stock following their termination. The parties have now filed cross-motions for summary judgment. The Plaintiffs seek a declaration that the contracts have been violated as a matter of law and that they are entitled to damages under the Pennsylvania Wage Payment and Collection Law (the "WPCL"), 43 P.S. § 260.1 *et seq.* Monsanto seeks judgment on all of Plaintiffs' claims except those set forth in the margin.[1]

---

1. Plaintiffs' have agreed to withdraw the following claims: annual cash awards for 1998 due to Wetherington and Galdieri; Count II (Breach of Fiduciary Duty); Count III (Specific Performance); Count VI (ERISA), with the condition that if Monsanto renews its ERISA defense, the ERISA claim is reinstated. Monsanto previously moved to dismiss Plaintiffs' claims on the basis that they were preempted by the ERISA, and the Court denied its motion without prejudice to reassert on summary judgment. Despite the Court's invitation to do so, Monsanto has declined to brief the issue in light of the fully developed record.

## II. BACKGROUND

Before their employment with Monsanto, the Plaintiffs were executives at a corporation named Diamonex, an entrepreneurial business developing a diamond-based material for use as a protective coating in commercial settings. In 1992, Monsanto purchased Diamonex and retained the Plaintiffs as executives. Each of the Plaintiffs signed an Employment Agreement with Monsanto in 1992. (Hoover Dep. at 100–02 & 116; Ayars Dep., Exs. 1–3).

With financial backing by Monsanto, Diamonex developed a new technology called "Water White" which permitted the manufacture of a clear, super-hard coating. Diamonex's original product had a brownish tint. The Water White technology permitted Diamonex's foray into the eyeglass (ophthalmic) lens business. (Galdieri Dep. at 27, 34–35, 125–37). Diamonex altered its business strategy to focus on branded prescription lenses, the sale of lens coating, and coating lenses for other lens manufacturers. (Galdieri Dep. at 156–58). Diamonex also linked with a lens manufacturer named Gentex in a new joint venture to coat sunglass lenses. (Hoover Dep. 82–89; Galdieri Dep. 128–32).

Starting in 1995 and lasting through at least 1998, Monsanto began a major restructuring of its entrepreneurial chemical businesses. The parties hotly contest the reasons behind the restructuring and the method in which it was carried out. They do not dispute, however, that senior Monsanto executive Pierre Hochuli assumed oversight of Monsanto's entrepreneurial companies in 1995. (Shapiro Dep. 14–15). Such companies were placed into a working group called "Monsanto Growth Enterprises," or MGE. (*Id.*; Hoover Dep. at 400–03).

About this time, Monsanto spent $30 million to build a new facility for Diamonex in Allentown, Pennsylvania. (Hoover Dep. 499–02; Galdieri Dep. at 165–66, 240, 337–38). Monsanto also attempted to purchase a lens supplier for Diamonex. An attempt to buy out GenTex floundered, but Monsanto secured exclusive rights to the Water White technology for about $15 million in 1995. (Hoover Dep. at 194–96; Galdieri Dep. at 128–32; 181–82, 188, 218–19). Monsanto acquired a lens manufacturer called Orcolite in 1996 for $53 million to replace GenTex as a source for lenses. (Hoover Dep. at 189–94; 439–43; Galdieri Dep. at 176–85, 421–22, 428).

Monsanto also split Diamonex into two entities: Diamonex Optical Performance Group ("OPG") and Diamonex Performance Products ("PPG"). OPG was to focus on eyewear lens coating and PPG would develop and market other uses of the coating technology. (Hoover Dep. at 479–83; Galdieri Dep. at 222–23; 300–01, 439). Dr. Hoover took charge of PPG. Dr. Wetherington became President of OPG and Galdieri was appointed Vice President of OPG. Hoover also retained some responsibilities within OPG. (Hoover Dep. at 502–505; Galdieri Dep. at 439–441).

As 1995 progressed, a rift developed between the Plaintiffs and Monsanto over management and control of the Diamonex businesses, leading the parties to renegotiate the 1992 Employment Agreements. (Hoover Dep. at 515–34; Galdieri Dep. at 247–58). One of the key discussions was the creation of a new incentive compensation plan for the Plaintiffs which would reward them in the event Diamonex increased in value. (Rowold Dep. at 122, 191; Williams Dep. at 112–25; Galdieri Dep. at 305–08).

Negotiations ensued and the parties executed new employment agreements with Monsanto in 1995 ("the 1995 Employment

Agreements").[2] Within the time frame required for execution, however, the parties still could not agree to the specifics for an inventive compensation plan. Instead, they appended a document called "Exhibit C" to the 1995 Employment Agreements setting forth certain parameters which any incentive plan had to meet. Monsanto was required to develop and approve such a plan. (1995 Employment Agreement ¶ 3.2(i)). Monsanto could also establish other compensation plans providing cash bonuses, stock options, and similar programs. (*Id.* at ¶ 3.2(ii)). Exhibit C specifically provided that:

> [A]n incentive compensation plan or plans shall be developed by the Company [Monsanto] for approval by the Company's Compensation Committee (collectively and/or individually, as appropriate in the context, the "Plan").

(Exhibit C, preamble). The Plan required the implementation of several items. First among these criteria was that the Plan:

> be designed in a manner that the Company reasonably determines will reward Executive [each Plaintiff] for his contribution to the "value created" within the Diamonex Business during the Plan period which value is derived form sources and efforts other than capital and other monetary and non-monetary types of contributions by the Company [Monsanto] to the Diamonex business. The "value created will be measured or determined based on financial parameter(s)," e.g. "Economic Value Added" (EVA) or another approach which compares the value of the Diamonex Business at some future point in time to the value of the Diamonex business at the start of the Plan period and determines the extent

to which the difference in value derives from other than from capital and other monetary and non-monetary types of contributions by the Company to the Diamonex business.

(Exhibit C at ¶ 1). The Plan was to cover a three year period from January 1, 1996 through December 31, 1998. (Exhibit C at ¶ 2). A target incentive award of $800,000 was set if Diamonex performed at target levels during the plan period, but no minimum or maximum value was set. (Exhibit C at ¶ 3). Paragraph 4 of Exhibit C sets forth a complex system of metrics which had to be addressed *if* Monsanto opted for an EVA plan. Exhibit C also provided that Plaintiffs':

> ELIGIBILITY TO RECEIVE AN AWARD UNDER THE PLAN, THE AMOUNT OF ANY AWARD, THE PORTION PAID, THE PORTION BANKED AND THE AMOUNT OF ADJUSTMENTS TO BANKED AMOUNTS PRIOR TO PAYOUT, WILL BE DETERMINED BY THE MONSANTO COMPANY COMPENSATION COMMITTEE (THE "COMMITTEE"), OR ITS DELEGATE, AS APPROPRIATE, IN ITS SOLE DISCRETION.

(Exhibit C at ¶ 7)(capitals in original).

Following the execution of the 1995 Employment Agreement, the Plaintiffs and several Monsanto executives worked to devise a plan which met the criteria of Exhibit C. After considering an EVA plan and a "Phantom Stock" plan, MGE Human Relations Director Alan Rowold eventually created an incentive program using restricted stock as the primary vehicle to meet the $800,000 target commitment for 1996. (Rowold Dep. at 246).[3] Mr. Hochu-

---

**2.** The Employment Agreements of Plaintiffs Galdieri, Hoover, and Wetherington were identical in all material aspects.

**3.** Restricted Stock was issued for all executives in MGE companies for 1996. (Ayars Dep., Ex. 14).

li informed the Plaintiffs by a letter dated March 10, 1997 that they would be provided with the Restricted Stock for their 1996 incentive compensation and that the restrictions would be released once the Monsanto Compensation Committee had determined that value was created for Monsanto. (Ayars Dep., Ex. 14). The letter also indicated that further details regarding the Restricted Stock could be found in certificates attached to the letter, but no certificates were attached. (*Id.*). Bestowal of the Restricted Stock Options was delayed until December 1997, after the "spin-off" of Monsanto's chemical business. (Hoover Dep. at 771–72 & Ex. 79; Galdieri Dep., Ex. 48). At that time, Monsanto produced Restricted Stock Contracts stating that the stock restrictions would be removed when the Compensation Committee determined that value was added to Monsanto's ophthalmics platform. (Ayars Dep., Ex. 43 ¶ 5). Plaintiffs executed the agreements on October 13, 1997 with a proviso that they did not "waive any legal rights or benefits under the terms of [the] Employment Agreements dated October 5, 1995 with Monsanto Company." (Amended Complaint Exs. I & J; Hoover Aff.).

For Plaintiffs' 1997 incentive compensation, Monsanto sought to use a special "Performance Stock Option Grant." (Galdieri Dep., Ex. 48). The options would vest based on the performance of the Diamonex businesses. (Hoover Dep., Ex. 79 at p. 3). The Performance Stock options were awarded in February 1997. Monsanto also implemented a Cash Incentive Opportunity for 1998.

In November 1997, Hochuli informed the Plaintiffs that the Diamonex businesses were to be offered for sale. (Hoover Dep. at 181). The parties dispute Monsanto's reasons. The Plaintiffs claim that Monsanto wanted to divest itself of the companies so it could concentrate on the "life sciences" business just as Diamonex was becoming profitable. Monsanto saw itself as pouring investment into a venture with continuing technical difficulties, management problems, perennial budget shortfalls and which had never turned a profit.

Monsanto attempted to sell Diamonex OPG, Diamonex PPG, and Orcolite as a package. (Hoover Dep. at 902–05; Wolpert at 95–96). Prior to the sale, Monsanto provided personal compensation summaries to the Plaintiffs, advising them that the Restricted Stock would be released based upon: (a) a combination of sale price versus book value and sale price versus economic value; Plaintiffs' effectiveness in operating the business to bring the continuing expected value to the buyer; (c) the individual contribution of the Plaintiffs to this process consistent with protecting Monsanto's interests; (d) appropriate overall incentive award given the assessment of contribution. (Amended Complaint, Exs. G & H; Hoover Dep. Ex. 98). The 1997 Stock Options were exercisable for up to twelve months following Plaintiffs' termination without cause. (*Id.*) The 1998 Cash Inventive Opportunity would be "prorated based on the number of months the business is owned by Monsanto," with a range from zero to $274,500.

No buyer could be found willing to purchase Diamonex PPG, Diamonex OPG, and Orcolite as a group. Instead, Orcolite was sold for roughly $100 million, rendering a $23 million profit for Monsanto. (Maus Dep. at 197). Diamonex PPG was sold for only ten dollars with a promise of a greater return if the buyer could resell the company. Ultimately, Diamonex PPG was resold for $13,750,000 and Monsanto realized a profit upon the resale. (Hoover Dep., Ex. 2). No one was allegedly found to purchase Diamonex OPG; the company

was shut down in May 1998. (Hoover Dep. at 974; Wolpert Dep. at 154).

When Diamonex OPG was closed, Plaintiffs Galdieri and Wetherington were terminated without cause. (Ayars Exs. 52–54). Their 1997 Stock Options vested. Galdieri and Wetherington asked Monsanto to remove the restrictions on their stock. (Ayars Ex. 55; Maus Dep. 135; Maus Ex. 8; Hoover Aff.), pointing to paragraph 6.4 of the 1995 Employment Agreement entitling Plaintiffs to "any incentive compensation awarded with respect to previous periods and unpaid as of the date of termination." Monsanto responded that Plaintiffs did not deserve the stock because they had not created value for Monsanto. (Maus Dep. at 138–39; Maus Dep., Exs. 5, 6, and 7; Ayars Dep., Ex. 54). Monsanto cancelled the awards of Restricted Stock. (Galdieri Dep., Ex. 90; Maus Dep., Ex. 6). No cash incentive payments were issued for 1998.

Hoover remained with Diamonex PPG until October 1998. At that time, his 1997 Stock Options vested but was also informed that the restrictions on his stock would not be released. He was paid $67,711 for his 1998 incentive award, or 25% of the overall projection. (Hoover Dep., Ex. 126).

Plaintiffs Galdieri and Wetherington filed the instant action on March 1, 2000, and Hoover joined them as a plaintiff on September 17, 2001. The parties have now filed cross-motions for summary judgment.

This Court has diversity jurisdiction under 28 U.S.C. § 1332.

## III. DISCUSSION

### A. Standard of Review

On a motion for summary judgment, a court must determine whether, on the record presented by the parties, "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of proving that there is no dispute as to a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden then shifts to the opposing party to set forth specific facts demonstrating a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue exists only if the there is sufficient evidence to enable a reasonable jury to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence must be viewed in the light most favorable to the non-movant. *See Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995).

### B. Choice of Law

The 1995 Employment Agreement contains a clause designating Pennsylvania as its chosen law. However, Exhibit C calls for the application of Delaware law to the incentive compensation plan ("the Plan") and all actions taken under it. (Exhibit C at ¶ 10). The parties dispute which choice of law clause should govern. Plaintiffs argue that no legal decisions need to be taken with respect to the Plan because no Plan was created; the case therefore calls for an interpretation of the Employment Agreement and Exhibit C themselves, which should be conducted under Pennsylvania law. Monsanto retorts the combination of Restricted Stock, 1997 Stock Options, and 1998 Cash Incentives satisfied the contractual requirements for the Plan and is therefore governed by Delaware law.

The Court believes the correct approach is to apply Pennsylvania law to determine whether the Monsanto's combination plan

met the conditions of 1995 Employment Agreement and Exhibit C. If it did, further analysis should be performed under Delaware law. This approach, however, is needlessly redundant and confusing. The parties agree that the governing principles are the same in both states. Therefore, the Court will simply analyze the issues presented under both Pennsylvania and Delaware law.

## C. Contract Claims

■ Plaintiffs' contract claim proceeds under two theories. First, that Monsanto failed to implement an incentive program which complied with the 1995 Employment Agreement and Exhibit C. Second, they contend that Monsanto was contractually obligated to lift the restrictions on the stock issued in 1997. The parties have both moved for summary judgment on the contract claims.[4] The Court finds that the relevant language of 1995 Employment Agreements and Exhibit C is susceptible to more than one interpretation, is ambiguous, and cannot be construed as a matter of law. *See Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 93 (3d Cir.2001)(stating contract may be found ambiguous under Pennsylvania law if reasonably or fairly susceptible of different construction); *Vanderbilt Income & Growth Assocs. v. Arvida / JMB Managers,* 691 A.2d 609, 613 (Del.1996)(same under Delaware law).

### 1. Development of Incentive Plan in Compliance with Exhibit C

### a. Plaintiff's Motion for Partial Summary Judgment

■ Plaintiffs seek a declaration that Monsanto violated paragraph 3.2(i) of the

1995 Employment Agreement and Exhibit C by failing to adopt and approve a conforming incentive plan. They contend that Monsanto breached three separate provisions of Exhibit C: (1) that the Plaintiffs are to be compensated for "value created" by the Plaintiffs measured solely by "financial parameters"; (2) that the Plan was to cover the entire three year period from 1996 through 1998 ending automatically in 1998, but Monsanto used a series of plans spanning only one year and did not develop any plan for 1998; and (3) that Exhibit C called for a target award of $800,000 without any cap on the potential incentive payment, and the plan implemented by Monsanto was inherently finite because it was tied to a set amount of stock. Any plan which Monsanto did implement, they contend, falls under paragraph 3.2(ii) of the 1995 Employment Agreement permitting compensation plans in addition to the one governed by Exhibit C. Monsanto responds that the combination of Restricted Stock, the 1997 Stock Options, and the 1998 Cash Incentives fulfilled its obligations to create an incentive plan. It emphasizes that it had broad discretion under Exhibit C to design the incentive plan and to decide eligibility for benefits under the plan.

First, the Plaintiffs contend that the incentive compensation plan had to be created to compensate the Plaintiffs for "value created" in Diamonex, and such value could only be measured by "financial parameters." However, Exhibit C permits value to be measured by either financial parameters "or another approach which compares the value of the Diamonex Busi-

---

4. In order to prevail on claim for breach of contract, a plaintiff must show: (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) resultant damages. *See J.F. Walker Co. Inc. v. Excali-* *bur Oil Group, Inc.,* 792 A.2d 1269, 1272 (Pa.Super.2002); *Winston v. Mandor,* 710 A.2d 835, 840 (Del.Ch.1997). The Court's focus is on the second element.

ness at some future point in time to the value of the Diamonex Business at the start of the Plan period." Exhibit C also calls for consideration of "non-monetary" values contributed by Monsanto—which suggests that the parties may not have contemplated that the Plan would need to account for factors which could not be reflected under a pure financial valuation approach. Even Plaintiff Galdieri recognized that financial value is not strictly limited to financial numbers, but also may account for performance and management of the business and other various factors. (Galdieri Dep. at 319–30). Each element of Monsanto's combination plan—the Restricted Stock, the 1997 Stock Options, and the 1998 Cash Incentives—attempted in some manner to link incentive awards to economic value in Diamonex. It must be recalled that Monsanto was given a great deal of discretion under Exhibit C to determine how to account for value created.[5] It is up to a jury to determine whether the plan which Monsanto implemented sufficiently and appropriately measured the value which the Plaintiffs created in Diamonex.

Second, while Exhibit C does call for the implementation of a plan covering the three year period from 1996 through 1998, the plain language does not mandate that it be one single and continuous plan. Indeed, the preamble to Exhibit C employs the awkward phrase "plan or plans," which contradicts the notion that only a single plan was intended. Monsanto was free to develop several plans if, on the whole, they provided the Plaintiffs with the compensation they were due under Exhibit C. Plaintiffs also contend that while Exhibit C requires that the Plan terminate automatically at the end of the three year period, Monsanto's combination plan had no automatic end in 1998. However, while these individual elements of Monsanto's plan may not have each ended in 1998, the Court cannot say as a matter of law that inclusion of these vehicles themselves breached the Contract, provided a mechanism existed to automatically provide the Plaintiffs with compensation at the end of three years.

Third, the Court does recognize that Plaintiffs have correctly asserted one reasonable reading of Exhibit C's reference to an $800,000 target award in paragraph 3 and description of financial metrics in paragraph 4. Exhibit C may mean that Plaintiffs were entitled to $800,000 each

5. Plaintiffs cite to *In re New Valley Corporation*, 89 F.3d 143 (3d Cir.1996) for the proposition that an employer wishing to impose its terms on an employee could include contract language more supportive of its interpretation. *See id.* at 151. Because Monsanto did not retain the right to choose among alternatives, Monsanto was forced to choose between either a EVA or a mechanism which compares the value of the Diamonex business at different points in time.

In *New Valley*, decided under the federal common law of contract, involved ERISA benefits provided under a "top hat" plan. The employer sought to terminate benefits under the plan after the employee had already worked and retired by relying on a clause in a plan document reserving the employer's right to amend the plan "at any time, for any reason."

The Third Circuit found that the term "at any time" was ambiguous because permitted an employer to terminate top hat benefits after the employee had already worked, retired, and vested his benefits absent explicit language permitting it to do so. The court rested upon the employee's reasonable expectation that he would receive benefits upon retirement and other contract language indicating the contract was to be binding.

Here, in contrast, the Plaintiffs played a key role in drafting the contract language at issue, weakening the drive to construe ambiguities in language against the employer. Thus, the Court is content that the contract language now in dispute might be read to afford Monsanto the right to choose among a variety of means to measure value created.

year if Diamonex met certain value levels set for each year, with the potential for uncapped incentive payments in the event Diamonex's financial value grew. However, Monsanto's reading is also reasonable: that the metrics and financial parameters in paragraph 4 were only relevant if Monsanto decided to implement an EVA plan. As the parties agree, Monsanto decided against an EVA plan for the Plaintiffs. Plaintiffs also emphasize that no cap was to be placed on their potential compensation under the plan, but Mr. Rowold designed the Restricted Stock / Performance Stock Options plan with an $800,000 cap in mind. (Rowold Dep. at 346–47). However, there appears to be a dispute as to the value of the plan actually implemented by Monsanto. The 1996 Restricted Stock, the 1997 Performance Stock Options, and the cash incentives may have indeed provided the Plaintiffs with sufficient compensation. The Court has reviewed Mr. Rowold's deposition and is unprepared to say the he definitively capped Plaintiff's annual compensation at $800,000; rather he may have merely used $800,000 as a base figure. Plaintiffs may ultimately be correct as to Mr. Rowold's intentions, but the issue remains one of fact.

One final issue remains: Plaintiffs assert that no incentive Plan was implemented for 1998. Monsanto points to the 1998 Cash Incentive Opportunity Plan which it established. It argues, however, that Plaintiffs Galdieri and Wetherington were deemed ineligible for the award because they created no value in Diamonex, and Hoover was awarded 25% of the award. Again, the parties have pointed to a factual issue.

Plaintiffs assert a handful of other technical ways that Monsanto is in breach. Having reviewed these contentions, the Court finds they do not warrant entry of summary judgment in Plaintiffs' favor.

### b. Monsanto's Motion for Summary Judgment

Monsanto also moved for summary judgment seeking a declaration that the incentive compensation plan which it implemented conformed with the 1995 Employment Agreement and Exhibit C. Many of its arguments are premised on contract terms which this Court has now ruled are ambiguous. In particular, it relies on the contract language affording it broad discretion as to the specifics of the plan and whether an award should be issued. As discussed above, Monsanto's discretion was circumscribed; it could only exercise its judgment within the framework of Exhibit C.

Specifically, Monsanto also seeks the Court to bar the Plaintiffs from introducing evidence as to their estimation of Diamonex's worth. It contends that the plan gave it total discretion to determine Plaintiff's eligibility for an award under the plan and the amount of any award. Thus, the Court should defer to its decision. (Def. Mot. for Summ. Judg. at 34–37). To that end, it cites *McIntyre v. Philadelphia Suburban Corp.,* 90 F.Supp.2d 596 (E.D.Pa.2000)(R.F. Kelly, J.) and *Research & Trading Corp. v. Pfuhl,* Civ. A. No. 12527, 1992 WL 345465 (Del. Ch. Nov. 19, 1992).

Both cases are inapposite. The *Research and Trading* case involved a corporate executive who allegedly breached his covenant not to compete. In his defense, he alleged a prior breach by his employer in failing to implement an incentive stock ownership plan. However, the court found that while the parties had discussed requiring the execution of such a plan, they never in fact did. Pfuhl sought to enforce an agreement term which did not exist. *See id.* at *9–10.

In *McIntyre,* the court deferred to a decision by a corporate compensation com-

mittee because the compensation plan expressly provided that committee would have final and conclusive authority over administration of the plan. *See McIntyre,* 90 F.Supp.2d at 599–600. Here, in contrast, the 1995 Employment Agreement does not vest unbridled discretion in Monsanto's Compensation Committee to determine the amount of benefits due. Plaintiff has put forward a valid reading of Exhibit C which indicates that Plaintiffs were to be compensated under a metrics formula (or analogous process) directly tying their compensation to economic value created in Diamonex. A large amount of parol evidence supports their reading. If the Plaintiffs are correct in their construction of the Contract, Monsanto discretion was constrained. Under these circumstances, the Court does not find that it must give · blind deference to Monsanto's administration of the plan.

██ Monsanto also argues that the Plaintiffs and their lawyers drafted the contract provisions now in dispute. Therefore, it urges the Court to apply the *contra proferentem* rule and construe any ambiguous contract language against its drafter. However, record evidence reflects a number of exchanges of draft language between the parties. These drafts indicate that the parties engaged in free and bilateral negotiations, rendering automatic application of the *contra proferentem* rule inappropriate. *See Burns Mfg. Co. v. Boehm,* 467 Pa. 307, 356 A.2d 763, 767 (1976) (citations omitted); *Sun Co. v. Pennsylvania Turnpike Comm'n,* 708 A.2d 875, 879 (1998); *see also SI Mgmt. L.P. v. Charlebois,* 707 A.2d 37, 43 (Del. Supr.1998).

## 2. Restricted Stock Awards and Section 6.4(a) of the Employment Agreement

Plaintiffs also seek judgment in their favor on their claim that Monsanto wrongly refused to lift restrictions placed on the Restricted Stock when they were terminated without cause in 1998. They first claim that they were entitled to the unconditional vestment of the stock under paragraph 6.4 of their Employment Agreement. Alternately, they contend that Monsanto should remove the restrictions on their stock just as Monsanto removed them for other executives in Monsanto's ophthalmics platform (*i.e.,* the cluster of companies including Diamonex OPG, Diamonex PPG, and Orcolite). Plaintiffs also contend that the Restricted Stock were wages within the meaning of the WPCL and seek 25% liquidated damages and attorneys fees.

Monsanto cross-moves for summary judgment arguing that the Plaintiffs had to create value in Diamonex before the restrictions were lifted.

### a. Right to Vestment of the Restricted Stock upon Termination without Cause under Paragraph 6.4 of the 1995 Employment Agreement

██ Paragraph 6.4 of the 1995 Employment Agreement provides for the tender of several benefits upon the Plaintiff's termination without cause. The parties now dispute under which subclause of 6.4 the Restricted Stock grants should fall: a provision calling for automatic payment upon termination or another clause permitting vestment only if allowed under the terms of a compensation plan issued by Monsanto.

Under the first subclause, the Plaintiff Executives were entitled to: "any incentive compensation awarded with respect to previous periods and unpaid as of the date of termination of Executive's employment." (¶ 6.4(a)(iv)). Plaintiffs contend

that the Restricted Stock awarded March 10, 1997 falls within this subclause. Upon Plaintiffs' termination without cause, they were immediately entitled to have the restrictions removed. They point to documents in which Hochuli described the Restricted Stock as an "award," confirming their contention that the Restricted Stock is governed by 6.4(a)(iv).

Monsanto counters that Plaintiffs rely on the wrong subclause of the Employment Agreement. A later provision in paragraph six of the 1995 Employment Agreement permits the immediate vesting of the Plaintiffs' interest in any outstanding compensation or benefits plans only "to the extent not ... contrary to the generally applicable terms of the plans under which such compensation of benefits are provided." (¶ 6.4(a)(vi)). Under Monsanto's reading, the Restricted Stock need not vest because a pre-condition stated in the Restricted Stock Contracts had not been met: a Monsanto Compensation Committee determination that the Plaintiffs had added value to the business. Although Mr. Hochuli referred to the Restricted Stock as an award, he informed the Plaintiffs when they were first notified of the Restricted Stock "plan" that lifting the restrictions would be contingent upon the value creation. This condition of the Restricted Stock Contract takes precedence over the Employment Agreement requirement. Because the Plaintiffs had not met the preconditions for the lifting of the stock restrictions, Monsanto urges it was justified in refusing to lift the stock restrictions.

Rather than viewing entitlement clause of 6.4(a)(iv) without reference to 6.4(a)(vi), Monsanto urges that the two clauses should be construed together and the parties' agreement read as a whole. *See Brown v. Cooke,* 707 A.2d 231, 233 (Pa.Super.Ct.1998)(requiring contract be inter-

preted as a whole with seemingly conflicting clauses read together, if possible); *see also National Union Fire Ins. Co. v. Rhone–Poulenc Basic Chems. Co.,* Civ. A. No. 87C–SE–11, 1992 WL 22690, at *19 (Del.Super.Ct. Jan. 16, 1992)(contract to be read as whole and each clause deserves consideration). When read together, Monsanto urges, it is apparent that subparagraph 6.4(a)(iv), which uses the term "paid," relates to incentive cash payments. In contrast, subparagraph 6.4(a)(vi) governs awards of unvested stock such as the Restricted stock. Plaintiffs point out that it is not uncommon for stock deals to be treated as payments. (Goldman Report at 6). They also emphasize that subparagraph 6.4(a)(iv) speaks in terms of incentive payments while 6.4(a)(vi) does not, which indicated if the Restricted Stock were part of an incentive compensation plan, the governing clause is 6.4(a)(vi).

The Court finds both parties have adduced reasonable readings of the various contracts at issue, and each is ambiguous. Although both parties attempt to resort to evidence of negotiations between the parties which might resolve the ambiguities in the contract language, much of this evidence conflicts, and the Court refuses to consider it on a motion for summary judgment. Each side will have the opportunity to present witnesses, exhibits, and arguments to a jury regarding the negotiations between the parties.

Turning to the Parties' subsidiary arguments, the Court also finds them without merit. The Plaintiffs correctly note that they amended the Restricted Stock Contracts of 1997 to preserve any rights they had under the 1995 Employment Agreement. But that begs the question of what rights the Plaintiffs had under the 1995 Employment Agreement.

Plaintiffs further contend that the Restricted Stock Contracts were not negoti-

ated and no additional consideration was received to support them, so any terms contained in the Restricted Stock Contracts are not binding. However, if Monsanto is correct that the Restricted Stock was a conforming incentive compensation plan, no additional consideration was required to create a contract: Monsanto had the right to impose conditions in keeping with Exhibit C.

Monsanto argues that the Plaintiffs' reading of the agreement would render subclause 6.4(a)(vi) superfluous. (Monsanto Resp. to Pl. Mot. for Summ. Judg. on Restricted Stock at 15–16, citing RESTATEMENT (SECOND) OF CONTRACTS §§ 202, 203). However, the subclause could refer to any number of compensation plans or benefits other than the Restricted Stock.

### b. Right to Vestment of Restricted Stock as Executives in the Ophthalmics Platform

■ Plaintiffs, working on the assumption that the Restricted Stock Grant Contracts govern the lifting of restrictions on the stock, also argue that the restrictions on their stock should have been lifted because similar restrictions were lifted for stock owned by Orcolite executives when Orcolite was sold. The Plaintiffs' Restricted Stock Contracts prohibited sale and disposition of the stock in paragraph 4, but called for the restrictions to be lifted to those executives who added value to the ophthalmics platform:

> The restrictions on the Restricted Stock set forth in paragraph 4 shall lapse (unless they lapse earlier pursuant to paragraph 6 or 7) as to any or all of the Restricted Stock, or the then remaining Restricted Stock, on the first business day after the Committee (or any successor to the Committee) from time to time approves the release of the restrictions set forth in paragraph 4, based upon the written certification of the Sector Head(s) responsible for the platform associated with the Participant or, in the event there is no Sector Head, the member of senior management to whom the Participant reports, that significant economic value has been created in the designated platform associated with the Participant to merit the release of the restrictions set forth in paragraph 4 as to any or all of the Restricted Stock.

(Restricted Stock Contract ¶ 5, found at Ayars Dep., Ex. 43). Bolstering their argument, they point to a March 10, 1997 letter from Hochuli indicating that the restrictions would be lifted based on a platform-wide valuation. (Ayars Dep., Ex. 14). Because Orcolite was sold for a profit of $23 million, and Orcolite and Diamonex were both part of Monsanto's ophthalmics platform, Monsanto should lift the restrictions. Whether Plaintiffs added value to the ophthalmics platform and whether or not the Diamonex companies themselves gained or lost value is without consequence.

Plaintiffs' argument on this point fails for several reasons. First, Monsanto can show that it lost millions of dollars on the ophthalmics platform overall. While Monsanto may have decided to lift the restrictions on Orcolite executives, the evidence does not conclusively show that it did so because value had been created in the ophthalmics platform as a whole.

Second, the Plaintiffs have not conclusively shown that they created overall value in Orcolite or in the ophthalmics platform. The Restricted Stock Contracts are susceptible to a reading that the individual executive must personally contribute to the platform's value. Again, according to Monsanto, the Restricted Stock Contracts were governed by the 1995 Employment Agreement and Exhibit C. Those documents clearly required each Plaintiff to

add value in order to receive incentive compensation. All parties are free to present evidence to the jury supporting their readings of the 1995 Employment Agreements, Exhibit C, and the Restricted Stock Contracts.

### c. WPCL

As both parties recognize, the WPCL does not create an entitlement to wages; rather, it provides a statutory remedy when earned wages are unpaid. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir.1990); *McIntyre v. Philadelphia Suburban Corp.*, 90 F.Supp.2d 596, 602 (E.D.Pa.2000)(R.F. Kelly, J.). The parties' contract determines whether or not wages are due. *See Weldon*, 896 F.2d at 801; *McIntyre*, 90 F.Supp.2d at 602. Because Plaintiffs cannot establish as a matter of law that they are entitled to wages in the form of Restricted Stock, they also have not shown their entitlement to remedies under the WPCL, if, indeed, Pennsylvania law applies.

### d. Payments Due under 1992 Employment Agreements

Lastly, Plaintiffs have a claim for benefits due under Employment Agreements signed in 1992. The parties have a genuine dispute as to whether Plaintiffs surrendered those benefits when they signed the 1995 Employment Agreements.

### D. Misrepresentation Claims

Monsanto moves to dismiss Count IV, Plaintiffs' claim for misrepresentation, under the "gist of the action" doctrine. The gist of the action doctrine bars torts claims arising solely from a contract between the parties. "To be construed as a tort action, the wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Phico Ins. Co. v. Presbyterian Med. Servs.*

*Corp.*, 444 Pa.Super. 221, 663 A.2d 753, 757 (1995) (citing *Bash v. Bell Tel. Co.*, 411 Pa.Super. 347, 601 A.2d 825 (1992)); *see also Heronemus v. Ulrick*, Civ. A. No. 97C–03–168–JOH, 1997 WL 524127, at *3 (Del.Super.Ct. July 9, 1997) (citing *Garber v. Whittaker*, 174 A. 34, 36 (Del.Super.Ct.1934)). Furthermore, tort actions arise from a breach of duty imposed by social policy rather than one assumed by agreement. *See Phico*, 663 A.2d at 757.

The Court has reviewed the allegations in Plaintiff's Amended Complaint (¶¶ 49–55) and the record now before it. Each allegation addresses a breach of duty incorporated into the parties' various agreements: Monsanto's promise and alleged failure to create a long term incentive plan. With the benefit of discovery, plaintiffs now assert:

> The essence of Plaintiff's misrepresentation claim is that Monsanto, knowing [the Plaintiffs] were key employees, induced them to enter into the 1995 Agreements, and thus remain in Monsanto's employ through the promise of the creation of a long-term incentive compensation program as required by Section 3.2(i) and Exhibit C.

(Pla. Br. in Opp. to Def. Mot. for Summ. Judg. at 36). The gist of Plaintiffs' claim is that Monsanto contractually agreed to establish a long term incentive plan and failed to perform. Their "breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform.'" *Pinkert v. John J. Olivieri, P.A.*, No. 99–380–SLR, 2001 WL 641737, at *5 (D.Del.2001); *see also Brickman Group v. CGU Ins. Co.*, 2001 WL 1736482, 53 Pa. D. & C. 4th 71, 83–84 (Ct.Com.Pl.2001)(invoking gist of the action doctrine to dismiss claim which at best alleged fraudulent inducement). Plaintiffs' misrepresentation

claim is intertwined with their contract claims. Therefore, Count IV is dismissed.

### E. Assertions of Estoppel

In Count V of their Amended Complaint, Plaintiffs seek recovery under an estoppel theory, without specifying whether they proceed under a promissory or equitable estoppel theory. Assuming the basis of the Plaintiff's claim was for promissory estoppel, Monsanto moved for summary judgment because promissory estoppel is not a viable claim where the parties have entered into a valid contract. *See Rho v. Vanguard OB/GYN Assocs.*, P.C., Civ. A. No. 98–1673, 1999 WL 228993, at *5 (E.D.Pa. April 20, 1999)(Hutton, J.).

 In their response brief, the Plaintiffs clarified their Amended Complaint referred to equitable estoppel. Equitable estoppel may be used to estop a defendant from asserting a particular defense. *See Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir.1990)(Pennsylvania law); *Williamson v. New Castle County*, Civ. A. No. 19019–NC, 2002 WL 453926, at *3 n. 21 (Del. Ch. Mar. 13, 2002). The Plaintiffs seek to prevent Monsanto from arguing that they did not earn their incentive compensation because: (1) Monsanto pledged to create a plan but never did; and (2) Monsanto precipitously shut down the Diamonex businesses during the Plan period. (Pl. Br. in Opp. to Def. Mot. for Summ. Judg. at 42). Plaintiff's second argument assumes that Monsanto's promise to create and approve a compensation plan "implie[s] that Monsanto would act in good faith to make available the conditions reasonably necessary to achieve the goal of earning a long-term incentive." (Pl. Br. in Opp. to Def. Mot. for Summ. Judg. at 42). In other words, they contend that Monsanto's failure to

properly support Diamonex and Monsanto's attempt to sell Diamonex during the Plan period estop it from arguing that the Plaintiffs did not deserve incentive awards.

 Promissory estoppel and equitable estoppel are related but separate theories. Both doctrines are rooted in the equitable notion that a person may be estopped by the person's own conduct and statements. *See Kreutzer v. Monterey County Herald Co.*, 560 Pa. 600, 747 A.2d 358, 361 (2000); *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 87 (Del.1998). However, the circumstances calling for the application of each differ. Equitable estoppel:

> [P]revents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment may be enforced in equity.

*Kreutzer*, 747 A.2d at 361; *see also Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990). Promissory estoppel, on the other hand, presumes a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance. *See Kreutzer*, 747 A.2d at 361 (citing Restatement (Second of Torts § 90)); *Lord v. Souder*, 748 A.2d 393, 399 (Del.2000). Such a promise is binding if injustice can be avoided only by enforcement of the promise. *See Kreutzer*, 747 A.2d at 361; *Lord*, 748 A.2d at 399. The Pennsylvania Supreme Court thus recently explained that when the *conduct* of a defendant is at issue, as opposed to a *promise*, the appropriate doctrine is equitable estoppel. *See id.* at 361–62.[6]

---

**6.** Although the Court could not find a case arising under Delaware law explicitly adopt-

 Plaintiffs here allege that Monsanto made two *representations:* first, an explicit promise that it would create and approve an incentive plan. However, this promise was explicitly incorporated into the parties' agreement. Contract law therefore provides the only appropriate remedy. *See Genencor Int'l, Inc. v. Novo Nordisk A/S,* 766 A.2d 8, 12 (Del.2000); *Rho,* 1999 WL 228993, at *5. The Court has already determined an issue of fact exists as to whether Monsanto created a plan which conforms with the 1995 Employment Agreement and Exhibit C. If Monsanto is correct that its combination plan fulfilled its obligations to the Plaintiffs, then the Court has no basis to estop Monsanto from arguing that the Plaintiffs did not earn their incentive compensation.

 Second, Plaintiffs assert that Monsanto's promise to create and approve an incentive plan implied a *good faith* promise to ensure Plaintiffs received incentive compensation. However, a "broad and vague implied promise" cannot support a claim of estoppel of either the promissory or equitable kind. *C & K Petroleum Prods., Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir.1988). Consonantly, "an argument or an inference will not support an estoppel." *Peoples Nat'l Bank v. Bartel,* 128 Pa.Super. 128, 193 A. 59, 60 (1937); *see also Employers' Liab. Assurance Corp. v. Madric,* 183 A.2d 182, 188 (Del.1962); *Rudnick v. Schoenberg,* 122 A. 902, 903 (Del.1923).

The Court denies Monsanto's motion for summary judgment at this stage. None-

theless, it remains to be seen whether Monsanto is estopped from arguing to the jury that Plaintiffs did not earn their incentive payments.

### F. Punitive Damages

In Count VII, Plaintiffs seek punitive damages. Because the Court dismissed Plaintiff's misrepresentation claims and no other vehicle exists for a punitive damage award, this claim is dismissed as well. *See Johnson v. Hyundai Motor Am.,* 698 A.2d 631, 639 (Pa.Super.1997); (punitive damages unavailable for breach of contract claim); *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996) (same "generally" true under Delaware law).

## IV. CONCLUSION

Based on the above, Plaintiff's Motions for Partial Summary Judgment are denied. Defendant's motion is granted with respect to Plaintiff's claims for misrepresentation and punitive damages and is denied in all other respects. An appropriate order follows.

### *ORDER*

**AND NOW,** this 7 day of **May, 2002,** upon consideration of the parties' cross-motions for summary judgment and the responses thereto, it is hereby **ORDERED** that:

(1) Defendant Monsanto's Motion for Summary Judgment (*document no. 49* )

---

ing this distinction, Delaware courts refer to equitable estoppel in terms of a party's prior conduct rather than its promises. *See e.g. Waggoner,* 581 A.2d at 1136 (Del.1990)(speaking in terms of reliance on conduct). Furthermore, the Delaware Supreme Court recently cited with approval Professor Corbin's confinement of equitable estoppel claims to those of "past or present fact" and promisso-

ry estoppel to misrepresentation of "future fact or intention regarding the future." *See Genecor Int'l,* 766 A.2d at 10, 12, nn. 2, 5 (citing 3 Corbin on Contracts § 8.11, at 45–47 (rev. ed.1996)). Insofar as Plaintiffs allege misrepresentations regarding Monsanto's future intentions, they seek relief under a theory of promissory estoppel.

is **GRANTED IN PART AND DENIED IN PART** as follows:

 (a) Plaintiffs' claims for Misrepresentation (Count IV of the Amended Complaint) and Punitive Damages (Count VII of the Amended Complaint) are **DISMISSED.**

 (b) In all other respects, Defendant's Motion is **DENIED.**

(2) Plaintiff's Motion for Partial Summary Judgment, Breach of Contract—Failure to Comply with Exhibit C (*document no. 47*) is **DENIED.**

(3) Plaintiff's Motion for Partial Summary Judgment, Breach of Contract—Restricted Stock (*document no. 48*) is **DENIED.**