Stuart A. **WILLIAMS,** an individual, and WSC Investments, LLC, a Pennsylvania Limited Liability Company, Plaintiffs,

v.

**HILTON GROUP, PLC, and Ladbrokes International Betting and Gaming, a division of Hilton Group, PLC,** Defendants.

No. CIV.A. 99–2024.

United States District Court,
W.D. Pennsylvania.

March 12, 2003.

David L. McClenahan, Esquire, Joseph Leibowicz, Esquire, Kirkpatrick & Lockhart LLP, Pittsburgh, PA, for Plaintiffs Williams & WSC Investments.

Danforth Newcomb, Esquire, John Gueli, Esquire, Daniel Schimmel, Esquire, Peter J. Kozlowski, Esquire, Shearman & Sterling, New York City, for Defendants Hilton & Ladbrokes.

Paul Titus, Esquire, Schnader, Harrison, Segal & Lewis, Pittsburgh, PA, for Defendant Ross.

*MEMORANDUM OPINION REGARDING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING PLAINTIFFS' TORT CLAIMS (ON COUNTS XII AND XIII) (DOCUMENT NO. 247)\**

SCHWAB, District Judge.

## I. Background

This case is about a Letter of Intent dated July 28, 1999 committing the parties to negotiate toward the execution of a

definitive purchase agreement; the definitive purchase agreement which was never consummated; and the nature of the relief available to plaintiffs for defendants' alleged breaches of contract and misrepresentations made before and during the course of negotiations and performance of the Letter of Intent.

Initially, the case began with a complaint filed December 14, 1999, alleging breach of contract claims against defendants Hilton Group, PLC, and Ladbrokes International Betting and Gaming, a division of Hilton Group, PLC (collectively "Ladbrokes"). This complaint sought injunctive relief and monetary damages, and was accompanied by an emergency motion for preliminary injunction to prevent Ladbrokes from alienating certain of its North American gaming assets which plaintiffs Stuart Williams and WSC Investments, LLC (collectively "Williams") believed they had a definitive purchase agreement to buy.

As this Court's previous opinion of August 8, 2000 (by Senior Judge Donald J. Lee, who was originally assigned to this case) summarized the action at that point, on the eve of an evidentiary hearing on plaintiffs' motion for a preliminary injunction:

> The parties also have succinctly stated their respective legal positions in their Pre–Trial Stipulation. In essence, plaintiffs contend that the Letter of Intent of July 28th [1999] obligated Ladbrokes to provide Williams with prompt access to due diligence materials and a due diligence review period of 60 days, to honor a period of exclusivity which would run from July 28th through the due diligence period and until a definitive purchase agreement was executed, and to negotiate in good faith the terms of a definitive purchase agreement and otherwise proceed in good faith. Plaintiffs further assert that Ladbrokes has materially breached each of these obligations and seeks a preliminary injunction to prevent Ladbrokes from selling or otherwise alienating the assets it agreed to sell to Williams until this matter has been fully adjudicated after a full trial. Plaintiffs also claim that Ladbrokes made binding obligations to sell their gaming interests to plaintiffs on November 19th [1999] by defendants' offer and Williams' acceptance of an oral agreement the terms of which were embodied in a Term Sheet, and by defendants' offer and Williams' acceptance of the terms of the draft definitive acquisition agreement dated November 30th [1999].

> Defendants counter that the parties intended and understood that they would not be bound regarding the purchase and sale of the Ladbrokes Assets unless and until a mutually acceptable definitive acquisition agreement was negotiated and executed. Because that condition, and other conditions of the Letter of Intent, never happened, neither the Letter of Intent, the Term Sheet of November 19th, nor the draft definitive acquisition agreement of November 30th resulted in a binding obligation or enforceable contract. Defendants also maintain that the terms of the Letter of Intent did not obligate Ladbrokes to provide Williams with exclusive negotiation rights unless and until Ladbrokes decided to provide him with due diligence materials in New York City, and until that time, Ladbrokes was free to shop around the deal to whomever it chose.

Mem. Op., August 8, 2000, at 11–12, *quoting* from Joint Pre–Trial Stipulation of Facts (Document No. 112).

## A. Contract Claims Limited to Reliance Damages—No Expectation Damages

The Court held, as a matter of law based upon stipulated and undisputed facts, that

there was no binding definitive purchase agreement requiring Ladbrokes to sell any of its North American gaming interests to Williams, but that the June 28, 1999 Letter of Intent *was* a binding agreement and that Ladbrokes breached the exclusivity provision of this agreement and its obligation to negotiate in good faith throughout the period of exclusivity. Mem. Op. and Order, August 8, 2000. On December 14, 2000, Judge Lee issued an opinion and order holding that plaintiffs were not entitled to expectation or restitution damages for defendants' breach of the Letter of Intent, but instead were entitled only to reliance damages.

On March 7, 2002, Judge Lee entered an opinion and order resolving the parties' motions for partial summary judgment which, *inter alia,* granted partial summary judgment in plaintiffs' favor as to liability only on Counts VII and XI for breach of the exclusivity provision of the Letter of Intent and defendants' obligation to negotiate in good faith, and denied defendants' motion to limit plaintiffs' reliance damages.

More recently, on February 24, 2003, this Court entered an opinion and order which denied defendants' motion to reconsider the order of March 7, 2002 entering summary judgment in favor of plaintiffs, as to liability only, on their contract claims, and by separate order entered on March 12, 2003, this Court denied plaintiffs' motion to reconsider the December 14, 2000 memorandum and order to the extent it limited plaintiffs' right to recover or seek expectation damages.

**B. The Tort Claims**

On June 9, 2000, plaintiffs filed a Second Amended Complaint which added Counts XII and XIII against Ladbrokes for, respectively, fraudulent and negligent misrepresentation under Pennsylvania common law, based upon alleged misrepresentations made before and during the period of exclusivity and the course of negotiations toward execution of a definitive purchase agreement. Plaintiffs' Third Amended Complaint of April 6, 2001 added defendant Alan Ross on the tort claims.

The Court's March 7, 2002 order also denied plaintiffs' motion for partial summary judgment on the tort counts, Counts XII and XIII, and denied defendants' motion for partial summary judgment on the issue of the availability of punitive damages for fraudulent misrepresentation.

On February 24, 2003, this Court granted defendants' motion for leave to file a motion for partial summary judgment as to the tort claims based upon the "gist of the action" doctrine, requesting the Court to reconsider its ruling of March 7, 2002. That ruling did not address the "gist of the action" doctrine which defendants now assert, but their current motion for partial summary judgment requires this Court to address and resolve this issue now, as follows.

**II. Decision**

**1. The Gist of the Action**

The "gist of the action" rule has not been addressed by the Supreme Court of Pennsylvania, but was first recognized in 1992 by the Superior Court of Pennsylvania in *Bash v. Bell Tel. Co.,* 411 Pa.Super. 347, 601 A.2d 825 (1992). As described recently by the United States Court of Appeals for the Third Circuit:

> Under [Pennsylvania's] "gist of the action" test,
>
> to be construed as a tort action, the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral.... [T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy

while the former lie for the breach of duties imposed by mutual consensus.

> *Redevelopment Auth. of Cambria County v. International Ins. Co.,* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) *(en banc) (quoting Phico Ins. Co. v. Presbyterian Med. Servs. Corp.,* 444 Pa.Super. 221, 663 A.2d 753, 757 (1995)). In other words, a claim should be limited to a contract claim when "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Bash v. Bell Telephone Co.,* 411 Pa.Super. 347, 601 A.2d 825, 830 (1992).

*Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 103–04 (3d Cir.2001).

Defendants correctly note that the gist of the action rule was first applied by a Pennsylvania appellate court in the context of a claim for fraud in *Etoll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10 (Pa.Super.2002). As Judge Maureen Lally–Green stated for the Superior Court panel, to date "no Pennsylvania state appellate case has addressed the interplay between fraud and the gist of the action doctrine" 811 A.2d at 15–16, but in predicting that the Supreme Court of Pennsylvania would adopt the doctrine and apply it to fraud claims, the Superior Court analyzed numerous "[f]ederal cases within the Third Circuit [that] have consistently applied the gist of the action test to fraud claims. The separate question of whether the fraud claim was actually barred by the doctrine appears to vary based on the individual circumstances and allegations of the plaintiff. In order to illustrate these principles ...," the Superior Court briefly discussed eleven federal district court decisions from within the Third Circuit dating from 1997 to 2002 applying the gist of the action rule to fraud claims, and predicted

the Supreme Court of Pennsylvania would do the same.

Summarizing the general principles gleaned from those federal cases, *Etoll* stated:

> ¶ 28 Thus, persuasive authority interpreting Pennsylvania law has restated the gist of the action doctrine in a number of similar ways. These courts have held that the doctrine bars tort claims: (1) "arising solely from a contract between the parties" *(Galdieri [v. Monsanto Co.,* 245 F.Supp.2d 636, 650 (E.D.Pa.2002)]); (2) where "the duties allegedly breached were created and grounded in the contract itself" *(Werner Kammann [Maschinenfabrik GmbH. v. Max Levy Autograph, Inc.,* 2002 WL 126634 at *6–7 (E.D.Pa.2002)]); (3) where "the liability stems from a contract" *(Asbury [Auto. Group LLC v. Chrysler Ins. Co.,* 2002 WL 15925 at *3 (E.D.Pa.2002)]); or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." *(Polymer Dynamics [, Inc. v. Bayer Corp.,* 2000 WL 1146622 at *6 (E.D.Pa.2000)]).
>
> ¶ 29 These courts have not carved out a categorical exception for fraud, and have not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself. Rather, the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.

*Etoll,* 811 A.2d at 19–20 (parallel citations omitted).

In *Etoll*, the appellants alleged that the defendants, an advertising company and its employees, had perpetrated a number of fraudulent schemes in the course of performing their contract with Etoll to market and advertise its product, including deliberately submitting bills containing fictitious charges and unauthorized markups; concealing less expensive ways to accomplish a "market launch" of the product; taking undisclosed kickbacks and commissions; and misrepresenting to Etoll that certain targets had no interest in email products, when in fact interest was high. The Superior Court held that these claims of fraud and misrepresentation were barred by the gist of the action rule, for the following reasons:

> All of these alleged acts of fraud arose in the course of the parties' contractual relationship. Moreover, the Appellees' duties regarding billing and performance were created and grounded in the parties' contract. Finally, these are the types of damages which would be compensable in an ordinary contract action; thus, the claim would essentially duplicate a breach of contract action to recover the allegedly-overbilled charges. The fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action. Rather, we conclude that the fraud claims are inextricably intertwined with the contract claims. Because the gist of appellant's fraud action lies in contract, the trial court did not err as a matter of law in dismissing the fraud claim under the gist of the action doctrine.

*Etoll*, 811 A.2d at 20–21.

In *Bohler–Uddeholm*, upon which plaintiffs rely, the United States Court of Appeals for the Third Circuit held that plaintiffs' tort claim for breach of fiduciary duty had its genesis in social policy defining the relationship of majority shareholder to minority shareholders, rather than upon the terms of the contract. This tort claim was collateral to the breach of contract claim, and so was not precluded by the gist of the action doctrine. 247 F.3d at 105. The jury was permitted, therefore, to consider the separate breach of fiduciary duty claim. On the other hand, plaintiffs' tort claim for misappropriation of trade secrets and confidential information was defined by agreement, and to the extent the jury verdict may have reflected an award of damages for misappropriation based upon the breach of related terms of the contract, it implicated the gist of the action doctrine. 247 F.3d at 106. To that extent, the Court of Appeals vacated the jury verdict and remanded the case to the district court.

In this case, the gist of Williams' tort claims set forth in Counts XII (Fraudulent Misrepresentation) and XIII (Negligent Misrepresentation) of their Third Amended Complaint "sounds in contract," and the allegations of fraud and negligence are inextricably intertwined with the breach of contract claims (at Counts VII and XI). Count XII avers that Ladbrokes and Ross represented falsely to Williams that they would sell Williams the Gaming Business for $120 million and that Williams would have immediate access to the due diligence materials for a 60 day period and until a definitive acquisition agreement had been reached. ¶¶ 146–49. Williams further avers that Ladbrokes and Ross, deliberately and in bad faith, failed to provide all due diligence materials or observe Williams' exclusivity rights, and failed to conclude the transaction. ¶¶ 150–52. Count XIII avers the same factual predicate, and claims Ladbrokes and Ross acted negligently in making the representations to Williams. ¶¶ 156–64.

Williams further alleges reliance on defendants' representations to their detriment and that Williams incurred substan-

tial expenses in performance of plaintiffs' end of the agreement. These are the types of damages which would be compensable if Williams succeeds on the contract claims, and so the reliance damages are duplicative of the same damages available in this case for breach of contract. Moreover, the contract claims are based upon the same conduct upon which Williams relies in the tort claims, namely Ladbrokes and Ross' failure to honor the exclusivity provision of the Letter of Intent and failure to negotiate in good faith during the period of exclusivity. Such conduct occurred mostly during the performance of the agreement embodied in the Letter of Intent.

The major difference between the tort and contract based causes of action is the enticing possibility of achieving an award of punitive damages in tort for the same conduct that breached Williams' contractual rights. However, "the need to provide a plaintiff additional tort remedies is diminished greatly when (1) the plaintiff can be made whole under contract law, and (2) allowing additional tort remedies will impose additional costs on society." *Etoll*, 811 A.2d at 20 n. 11, *quoting Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3rd Cir.2002) (interpreting Pennsylvania's closely related "economic loss rule" which prohibits plaintiffs from recovering tort damages when a product malfunctions or otherwise causes damage only to the product itself. In such cases, "contract damages (such as those provided in a breach of warranty action) are the sole remedy").

█ Adding the words "falsely" and "negligently" to the representations made in the course of reaching an agreement on the July 28th Letter of Intent, or alleging misconduct occurring during its performance or ulterior motive in inducing the agreement, does not convert what is essentially a contract action into a fraud or negligence claim. *See e.g., Galdieri*, 245 F.Supp.2d at 650 ("breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform"). The "parties' obligations have been defined by the terms" of the Letter of Intent, not by "larger social policies embodied in the law of torts." *Bohler–Uddeholm*, 247 F.3d at 104, *quoting Bash*, 601 A.2d at 830.

To the extent that the recent Pennsylvania Superior Court decision in *Jahanshahi v. Centura Dev. Co., Inc.*, 816 A.2d 1179 (Pa.Super.2003) (presented to the Court in plaintiffs' recent motion for reconsideration (Document No. 256)), is inconsistent with the above authority regarding the "gist of the action," the Court notes that decision does not mention that doctrine, and instead speaks in terms of misfeasance (as tort claim) and nonfeasance (as contract claim). *Jahanshahi* cannot be taken as direct authority contrary to the *Etoll* "gist of the action" line of cases. To the extent *Jahanshahi* is inconsistent with that line of cases, this Court finds *Etoll* and the cases upon which it relies to be more compelling.

## 2. The Law of the Case

Plaintiffs vigorously contend that the law of the case prevents this Court from reconsidering Judge Lee's previous ruling that there were genuine issues of material fact sufficient to permit the tort claims to proceed to the jury. Mem. Op. March 7, 2002 at 7–8. Under this doctrine, "one panel of an appellate court generally will not reconsider questions that another panel has decided on a prior appeal in the same case." *In re City of Philadelphia Litig.*, 158 F.3d 711, 717 (3d Cir.1998). Moreover, once an appellate court rules upon an issue decided by the district court, that court is ordinarily precluded from re-

considering or modifying its previous rulings. *United States v. Stanley,* 54 F.3d 103, 107 (2d Cir.1995); *see Al Tech Specialty Steel v. Allegheny Int'l Credit,* 104 F.3d 601, 605 (3d Cir.1997).

The doctrine also applies in the context of a district court's reconsideration of its own previous decisions, even in the absence of appellate decision. As recently explained by the United States Court of Appeals for the Third Circuit:

> "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or *necessarily resolved it by implication.*" *Aramony v. United Way of America,* 254 F.3d 403, 410 (2d Cir. 2001) (emphasis added) (citing 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 789 (1981)). Here, the prior panel did not "expressly" or by necessary implication decide the "shocks the conscience" issue [raised in second appeal]. The law-of-the-case doctrine relieves a court of the obligation of considering an issue *twice,* but *we must be careful to prevent the doctrine from being used to prevent a properly raised argument from being considered even once.* Where there is substantial doubt as to whether a prior panel actually decided an issue, the later panel should not be foreclosed from considering the issue.

*United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 397–98 (3d Cir.2003) (emphasis added).

■ The law of the case doctrine is not absolute but discretionary, and does not limit the power of a court to reconsider its own decisions prior to final judgment. *Aramony,* 254 F.3d at 410, *cited with approval* in *United Artists,* 316 F.3d at 398; *Coca–Cola Bottling Co. v. The Coca–Cola Co. (diet Coke VIII),* 988 F.2d 414, 429 (3d Cir.1993). Accordingly, the doctrine does not preclude reconsideration of previously decided issues in extraordinary circumstances, such as where new evidence is available, supervening new law has been announced, or the earlier decision was manifestly unjust. *In re City of Philadelphia Litig.,* 158 F.3d at 718.

■ While the law of the case doctrine "does not limit the power of trial judges to reconsider their prior decisions," [there are] two prudential considerations that limit a court's authority to do so: the trial court must explain on the record the reasoning behind its decision, and must take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling. *Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir.1997), *citing Swietlowich v. County of Bucks,* 610 F.2d 1157, 1164 (3d Cir.1979).

■ In this case, plaintiffs concede that the parties did not mention or directly address the "gist of the action" doctrine in the motions for partial summary judgment and supporting memoranda upon which Judge Lee based his ruling in March, 2002, and it is apparent that his opinion and order denying summary judgment as to the tort claims did not address or "by necessary implication" resolve that issue. Plaintiffs correctly point out that some of the cases defendants relied upon at that stage were discussed in the previous memoranda and opinion, but Judge Lee most certainly did not address the issue of the gist of the action, and there is, *at a minimum,* substantial doubt as to whether he implicitly resolved that issue which had not been raised. Accordingly, the law of the case doctrine does not preclude this Court from considering the gist of the action defense to the tort claims which defendants belated raise.

Moreover, there is no "prejudice" to plaintiffs in the sense described by the Court of Appeals in *Williams* where the plaintiff had proceeded to trial on the basis of the district court's pretrial ruling, and so could not have put on evidence conforming to that court's reconsidered decision on defendant's post trial motion for a new trial. By contrast herein, trial before this Court has yet to be scheduled, and plaintiffs will be given ample notice and opportunity to prepare for trial and conform their evidence to this Court's ruling.

### III. Conclusion

From the averments of the Third Amended Complaint, defendants' motion for partial summary judgment, plaintiffs' response thereto, the memoranda of law in support and opposition, and review of the record in this case and the opinions of my predecessor, the Court concludes that the gist of Williams' action is based upon defendants' alleged breach of contract/contractual duty to negotiate in good faith and provide plaintiffs with a period of exclusivity. Accordingly, defendants' motion for partial summary judgment (Document No. 247) will be granted, and plaintiffs' tort claims at Count XII (Fraudulent Misrepresentation) and Count XIII (Negligent Misrepresentation) will be dismissed with prejudice.

### ORDER OF COURT

**AND NOW**, after careful consideration of Defendants' Motion for Partial Summary Judgment Dismissing Plaintiffs' Tort Claims on Counts XII and XIII (Document No. 247),

**IT IS HEREBY ORDERED** that said motion is **GRANTED**, and that Plaintiffs' Tort Claims for fraudulent and negligent misrepresentation in, respectively, Counts XII and XIII of their Third Amended Complaint are **DISMISSED with prejudice.**

This Court is of the opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from this interlocutory order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).