**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3571-17T2

PETRIC & ASSOCIATES, INC.,

    Plaintiff-Respondent,

v.

CCA CIVIL, INC.,

    Defendant-Appellant.

_____

Argued December 9, 2019 – Decided June 8, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1596-16.

Lawrence S. Lustberg argued the cause for appellant (Gibbons PC, and Peckar & Abramson, PC, attorneys; Lawrence S. Lustberg, Jennifer Ann Hradil, Jason R. Halpin, Gerard J. Onorata, and Patrick Thomas Murray, on the briefs).

Eliza D. Stahl argued the cause for respondent (The Law Office of Eliza D. Stahl PC, attorneys; Eliza D. Stahl, on the brief).

PER CURIAM

Defendant CCA Civil, Inc., appeals from a jury verdict awarding plaintiff Petric & Associates $1,850,000 in damages, comprised of: 1) $300,000 for fraud; 2) $800,000 for breach of contract; 3) $250,000 for violation of the Prompt Payment Act (PPA), N.J.S.A. 2A:30A-1 to -2; and 4) $500,000 in punitive damages. Defendant also appeals from a series of related pre- and post-trial motion orders and a separate award of $260,911.36 in attorney's fees.

The jury considered a wealth of evidence that defendant fraudulently induced plaintiff to enter into a contract to install temporary shielding and work platforms on the Pulaski Skyway in Jersey City, Kearny, and Newark without informing plaintiff of the existence of high voltage Public Service Electric and Gas Company (PSE&G) wiring that not only would have altered plaintiff's decision to enter into the contract on the agreed terms, but also placed plaintiff's employees at significant risk of harm. The trial proofs also support the jury's determination that defendant breached the contract and acted with "actual malice" or "a wanton and willful disregard," see N.J.S.A. 2A:15-5.12, warranting the compensatory and punitive damages awards. However,

the trial proofs were insufficient for the jury to conclude that defendant violated the PPA.

We accordingly affirm the court's December 15, 2017 order denying summary judgment to defendant, the jury's January 25, 2018 verdict finding defendant liable for fraudulent inducement and breach of contract, its attendant compensatory and punitive damages awards, and the trial court's March 16, 2018 order denying defendant's motion to set aside the verdict or for a new trial. We reverse, however, the jury's verdict concluding that defendant violated the PPA. Based on our reversal of that count, we vacate and remand the court's March 29, 2018 order granting attorneys' fees to plaintiff, including its decision to grant a ten percent fee enhancement.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED BY FAILING TO REJECT PETRIC'S FRAUDULENT INDUCEMENT CLAIM AS A MATTER OF LAW.
>
> A. The Trial Court Erred in Denying CCA Civil's Motion for Summary Judgment as to Petric's Fraud Claim.
>
> B. The Trial Court erred in Denying CCA Civil's Motions for Judgment at Trial Because Petric Did Not Present Clear and Convincing Evidence of Fraud.

POINT II

THE TRIAL COURT ERRED BY FAILING TO REJECT PETRIC'S BREACH OF CONTRACT CLAIM AS A MATTER OF LAW.

A.    The Trial Court erred in Denying CCA Civil's Motion for Summary Judgment.

B.    Because Petric Failed to Show at Trial that CCA Civil Did Anything Other Than Fully Comply With its Obligations Under the Subcontract, the Trial Court Erred by Sending the Breach of Contract Claim to the Jury.

POINT III

BECAUSE CCA CIVIL WAS WITHIN ITS RIGHTS UNDER THE SUBCONTRACT TO WITHHOLD PAYMENT FROM PETRIC, THE TRIAL COURT ERRED IN DENYING SUMMARY JUDGMENT AS TO PETRIC'S PROMPT PAYMENT ACT CLAIM.

POINT IV

THE JURY AWARDED DUPLICATIVE DAMAGES FOR PETRIC'S FRAUD AND CONTRACT CLAIMS, AND THE DAMAGE AWARD MUST BE REDUCED.

A.    Petric's Contract Damages Can Not Exceed $382,373.87.

B.    Petric's Vague Reference to Lost Profits Cannot Justify the Damages Award Because Petric Failed to Establish Lost Profits with Reasonable Certainty.

4

POINT V

BECAUSE PETRIC OFFERED NO EVIDENCE
THAT CCA CIVIL ACTED WITH "EVIL MOTIVE,"
THE TRIAL COURT ERRED BY REFUSING TO
ELIMINATE THE PUNITIVE DAMAGES AWARD.

POINT VI

THE TRIAL COURT'S AWARD OF ATTORNEY'S
FEES MUST BE REDUCED BECAUSE PETRIC IS
NOT ENTITLED TO ATTORNEY'S FEES FOR ALL
OF ITS CLAIMS, NOR IS IT ENTITLED TO ANY
ENHANCEMENT.

## I.

We discuss the extensive procedural history and the trial evidence to provide context for our opinion.

Plaintiff was a small, family-owned industrial painting company run by the Petrics, Ellen, and Steven, wife and husband.[1] Plaintiff had been in business for approximately thirty years, and in that time worked on between thirty and forty projects for the New Jersey Department of Transportation (NJDOT). Steven, plaintiff's Vice President, testified that he was a civil engineer and a member of the Structural Steel Painting Council. In addition, at the time plaintiff bid on the Pulaski Skyway job, Steven had more than thirty

---

[1] For ease of reference, we refer to Ellen and Steven Petric by their first names, intending no disrespect.

years' experience in the industry, had worked on public projects for NJDOT, and was familiar with NJDOT's procedures and specifications, including change orders.

By letter dated June 28, 2013, defendant advised plaintiff of its intent to award plaintiff a subcontract to install temporary shielding and work platforms for the Pulaski Skyway project. On July 12, 2013, plaintiff submitted a formal bid to install a standard platform for $6.50 per square foot.

At trial, Steven testified regarding the parties' approximate two-month negotiation of the subcontract. He stated that the final design drawings revealed a complicated design, not the "standard" design originally anticipated by plaintiff, and they did not show any indication of PSE&G wire interference. He further testified that as a result of the more complicated design, plaintiff negotiated a higher unit price of $6.60 per square foot.

Michael Grant, defendant's former employee who negotiated the subcontract on defendant's behalf, testified as a witness for plaintiff and noted that one of the primary issues regarding the subcontract negotiations was prompt payment to plaintiff. He stated that because plaintiff "had just completed a project for which they had not received payment timely and they couldn't afford to finance" the current project, plaintiff was "in a precarious

financial position and . . . [defendant] knew it." In this regard, plaintiff agreed to perform the work for $6.60 per square foot, which Grant testified was "a much lower price to do the work than others would have given [defendant]," if defendant agreed to make timely payments.

NJDOT kept notes from progress meetings regarding the project between August and September 2013, which were admitted at trial. At each meeting, PSE&G and representatives of defendant spoke regarding PSE&G wire interference with the project. By way of example, as early as an August 14, 2013 meeting, the minutes provided that defendant's surveyor noticed a "PSE&G ramp close to installation of [the] electrical shield," and that "[a]t present it looks like issue of '[New Jersey High Voltage] Proximity Act'[2] violation."

Similarly, according to the progress meeting notes from an August 20, 2013 meeting, representatives from PSE&G indicated that within ten feet of the working area, "[t]here are open wires/exposed cover wires," which had "no insulation" and were unable to be insulated. In response, defendant's representatives asked whether there was "potential de-energizing" in that area,

---

[2] The New Jersey High Voltage Proximity Act (Proximity Act), N.J.S.A. 34:6-47.1 to -47.9, precludes contractors from performing work within a specified distance of high-voltage electrical lines.

and PSE&G responded in the negative. According to the sign-in sheets at each of the project meetings, Gregory Borovskis, defendant's project manager, and Dino Monioudis, defendant's assistant project manager, were present. Plaintiff did not have a representative at those meetings.

At trial, Dennis Persico, defendant's corporate representative, testified by deposition that by the August 20, 2013 meeting, "[defendant] knew about the condition [of] the high voltage of the cable lines and the proximity of the cable lines," but "[defendant] did not know at the time [it] signed [the] prime contract."

Steven performed a walk-through of the worksite along with plaintiff's superintendent/foreman Chad Eberle on August 22, 2013, prior to signing the subcontract, and both admitted seeing wires. Although the PSE&G wires were visible, both witnesses testified it was not apparent how close the wires would be in relation to the temporary shielding at the time of the walk-through. In this regard, Steven noted that he "was not allowed to climb up on the bridge and measure . . . how far it would be from [plaintiff's] work." Eberle likewise testified that though the PSE&G wires were visible from the ground, that perspective did not indicate their proximity in relation to the platform.

Further, as no platform had been designed when plaintiff inspected the site or bid on the project, and the wires were not identified on any NJDOT design drawings or specifications, Steven claimed that "because [he] didn't know the location of the platform in relation to those wires," he did not take them into account in preparing his bid. Defendant, however, introduced documentary evidence indicating that at a coordination meeting dated September 5, 2013, an unidentified representative of plaintiff suggested that the PSE&G wires be hiked up so as not to interfere with the project.

Plaintiff also introduced evidence that the high voltage nature of the PSE&G wires was not apparent at the time of the walk-through. For example, Eberle testified that when he eventually noticed the proximity of the wires, he "needed to contact [plaintiff] to get [defendant] to find out" whether the wires were high voltage or even live wires. Likewise, Persico stated on cross-examination at his deposition that "[a]t the time that you were able to see the wires, [he did not] think anyone was aware of the voltage in those wires . . . ." He further noted that a person could not determine whether the wires were high voltage by looking at them.

Steven testified that plaintiff "started getting ready to work" in early September before the subcontract was signed. On September 12, 2013, he was

9

approached in the field by Borovskis, who insisted he sign the subcontract. Steven initially declined because Ellen had negotiated the deal and he did not normally sign contracts on plaintiff's behalf. He called Ellen, who advised him the parties had agreed on final terms, so he signed the subcontract.

Pursuant to the subcontract, plaintiff agreed to install the temporary shielding at the Pulaski Skyway project for $6,765,000. Article 6 of the subcontract governed change orders on the project. Initially, it provided that "[a]ny change or adjustment in the [c]ontract price by virtue of . . . [a] Change Order shall be specifically stated in said Change Order." It also indicated that change orders "are subject to the terms of the subcontract," and that "[i]f [defendant] and/or [NJDOT] elects the option to direct the Change Order work to be done by [plaintiff] on a time and materials basis," plaintiff was obligated to "prepare daily time and materials invoices" to be submitted daily to defendant. Moreover, "[t]he allowable mark-up on time and material invoices [was] deemed to be full and complete compensation to [plaintiff] for all general and administrative expenses, overhead, supervision, and profit . . . ."

Regarding plaintiff's total compensation for change orders, Article 6 stated that plaintiff would not receive "any compensation or allowance for any Change Order in an amount greater than that which [defendant] actually

receives from [NJDOT], less a reasonable deduction for work incorporated therein which is performed by [defendant], as well as [defendant]'s overhead and profit."

Article 7 of the subcontract provided for claims by plaintiff "for extra work, additional and increased costs of contract work, delay and interference in the performance of its work, and/or for other damages for any cause whatsoever in connection with the performance of the [s]ubcontract . . . ." Where those costs are "directly or indirectly attributable to or arise out of the acts and omissions of [NJDOT] or [an architect/engineer]," they were not "chargeable to or recoverable from [defendant], and any legal right of [plaintiff] to otherwise assert such claim against [defendant] shall be fully liquidated by whatever recovery, if any, may be obtained on [plaintiff]'s behalf in the prosecution of its claim by [defendant] against [NJDOT] . . . ." Article 7 further permitted defendant, "in its sole discretion, [to] settle its entire claim, including that of [plaintiff], with [NJDOT]" and stated that plaintiff "expressly releases and discharges [defendant] from any and all liability for any such claims, except to the extent of any recovery as aforesaid."

The subcontract was supplemented and modified by Exhibit A and its accompanying Rider. Exhibit A to the subcontract, entitled "Scope of Work

11

and Subcontract Price," provided that where the subcontract conflicts with Exhibit A or the Rider, the provision in Exhibit A or the Rider would control. Further, Exhibit A required that defendant "provide monthly payments to [plaintiff] equal to wage and benefit costs incurred by [plaintiff] for work performed up to what [plaintiff] earned the previous month." It further provided that if NJDOT were to "make any monetary deductions from [defendant] due to work covered by this agreement, these deductions shall be made to [plaintiff]'s payment."

The Rider to Exhibit A also provided that "[plaintiff] agrees, for additional compensation, to perform extra work, conform and abide by all decisions issued by [defendant], when [defendant] has been directed to perform extra work, conform and abide by similar decisions issued by [NJDOT]." Further, under the Rider, plaintiff was "not . . . responsible for hidden conditions not detectable upon a reasonable inspection of the jobsite conditions" and, as noted, defendant was to "assist [plaintiff] to pursue additional compensation" pursuant to Article 6 of the subcontract.

Where additional work was proposed, plaintiff was "not . . . obligated to proceed . . . unless a price [was] agreed upon in writing." In the event an agreement could not be reached, defendant retained the ability to, "direct, in

12

writing, for [plaintiff] to perform the work on a time and material plus allowable markup per the [p]rime [c]ontract and Article 6" of the subcontract.

The Rider also stated that "[p]laintiff shall receive full compensation for all work performed including [c]hange [o]rder work as long as work is acceptable to [defendant] and [NJDOT]," and that compensation was not to be "unreasonably withheld and shall be given in a timely manner." Finally, the Rider revised Article 25 of the subcontract "to provide that the losing party shall be responsible for all costs, disbursements, and expenses, including reasonable attorney fees incurred by the prevailing party as a result of any claim or dispute between [plaintiff] and [defendant] if so directed by . . . the court."

As noted, Steven testified that he did not know about the PSE&G wire interference prior to bidding on the project or signing the subcontract and that had he known about the interference, he would never have signed it. "[E]xtra work," under the subcontract, payable on a time and material basis, had a lower percentage mark-up for profit and overhead than Steven testified he would have included in a bid. He explained: "If I were to price that PSE&G extra work when I bid the original quote, because of all the uncertainties and

actual overhead and actual profit that we normally use in our bidding, it would be $1 million."

Steven also testified at trial that on September 16, 2013, plaintiff began work on the project. The following day, plaintiff discovered that certain PSE&G wires were too close to the platform as designed. Immediately after discovering the PSE&G wire interference, Steven and Eberle notified Monioudis and Victor Uscilla, defendant's project field engineer, who stated they were "shocked" at the discovery.

Grant testified that he had no idea about the potential PSE&G wire interference until after the subcontract had been signed. According to Grant, "it was to [defendant]'s advantage to tell him everything that [defendant] knew or should have known in order to protect [defendant] when [he] wrote the schedule. So if . . . there was something wrong in the access to the job site, [defendant] could claim against [NJ]DOT."

The proximity of the high voltage PSE&G wires caused the plans for the installation of the temporary shielding to be altered. When plaintiff contacted defendant and described the updated plan, defendant directed plaintiff to proceed with the change and extra work related to the PSE&G wire interference on a time and material basis and plaintiff complied with that

14

directive. As a result of the PSE&G wire interference, plaintiff had to change the coordination and scheduling of its work, as well as the methods used to complete it. In this regard, plaintiff had to deliver materials from the ground up, instead of lowering them down from the bridge, which was more costly.

Furthermore, Steven testified that prior to discovering the PSE&G wire interference, plaintiff had planned on working one shift per day. However, even after the discovery, Steven stated that because the project operated on a fixed schedule, "there [were] no extensions allowed . . . which made it very difficult." Plaintiff had to increase its manpower in order to accommodate the schedule. As a result, plaintiff's employees worked triple shifts, twenty-four hours a day, seven days a week, and through rain and snow to make up for the delays caused by the wire interference. Steven testified he slept in a trailer on site most nights. Because of these changes, plaintiff began to experience further financial difficulties but nevertheless completed its work, on time, by the end of May 2014.

Defendant then filed a claim with NJDOT alleging that it was entitled to additional compensation because the PSE&G wire interference was an "existing latent condition." Defendant and plaintiff worked together to

15

produce a claims package for the additional work, using plaintiff's time and material costs documentation.

On May 12, 2014, defendant submitted a final claim package to NJDOT, in which it used minutes from the aforementioned project meetings to determine the amount of extra compensation needed. Defendant's claim included the total amount of plaintiff's time and material costs, which totaled $697,380.86. The entire claim, including the amounts claimed by defendant and other subcontractors, was approximately $1.2 million.

After meetings and discussions between NJDOT, defendant, and plaintiff, NJDOT discounted the claim based upon its specifications and offered $441,482.79 to plaintiff for the extra work on the PSE&G wire interference. Defendant communicated NJDOT's offer by way of e-mail to Ellen, who responded: "Please settle [plaintiff]'s portion of the PSE&G extra for $441,482.79."

Ellen testified that, meanwhile, in May 2014, when plaintiff had nearly completed its work on the project, defendant advised plaintiff that it would not be paid for its time and material costs related to the PSE&G wire interference until defendant was paid by NJDOT. By that time, plaintiff was due over $697,000 for the time and material costs related to the wire interference. In

response, plaintiff expressed its desire to pay its suppliers, unions, and insurance premiums, but defendant refused to make any payment because plaintiff "owed . . . too much to the vendors and the unions." Ellen stated she continued requesting the payments and began "begging" defendant because plaintiff "was desperate to get payments." Eventually, in March 2015, defendant used some of plaintiff's funds to pay two suppliers directly but maintained its refusal to pay plaintiff's union benefits.

As a result of plaintiff's inability to pay its bills, it received violation notices from the New Jersey Department of Labor, with interest, totaling approximately $126,000. On June 8, 2015, plaintiff was "debarred," meaning it was not allowed to work on public works projects for three years. Ellen and Steven were also personally debarred. As a result of those violations and the debarment, plaintiff was "effectively . . . put out of business" and at the time of Ellen's testimony at trial, was "no longer operating."

In November 2015, after plaintiff's debarment, defendant paid the unions with plaintiff's money. Notwithstanding the fact that the unions were eventually paid, plaintiff incurred interest and penalties on the late payment and remained debarred, and the Department of Labor turned over the debt

17

owed by plaintiff to a collection agency. Furthermore, at the time of trial, defendant still withheld $66,221.14 that was owed to plaintiff.

On April 19, 2016, plaintiff filed a complaint against defendant alleging: 1) violation of the PPA; 2) breach of contract; 3) unjust enrichment; 4) quantum meruit; 5) fraudulent inducement; and 6) breach of the covenant of good faith and fair dealing.

On November 3, 2017, defendant filed a motion for partial summary judgment on the breach of contract, unjust enrichment, quantum meruit, fraudulent inducement, and breach of the covenant of good faith and fair dealing counts. In support of its motion, defendant argued that the matter was "controlled by plain and unambiguous contract language," which defendant claimed it complied with "to the letter." Defendant contended that it "held full discretion to settle the claim itself . . ., but still only settled the claim once [plaintiff] gave its express written consent." It also maintained that plaintiff was "bound by the subcontract terms limiting its legal rights to assert any claim for further compensation, because recovery is capped by any such recover[y] that [defendant] could obtain on [plaintiff]'s behalf for the claim." Finally, defendant argued that plaintiff's claim was barred by the doctrine of accord and satisfaction.

A-3571-17T2

The following month, plaintiff filed a cross-motion for partial summary judgment on the PPA, breach of contract, fraudulent inducement, and attorneys' fees counts. The court found genuine issues of material fact regarding all claims and denied both parties' motions.

The matter proceeded to a jury trial which took place between January 9, 2018 and January 25, 2018. At trial, plaintiff presented live testimony from the Petrics, Jeffrey Overton, a NJDOT manager, Peter Wu, defendant's chairman, Eberle, and Grant, as well as documentary evidence. As noted, it also presented the deposition testimony of Persico.

Defendant presented testimony from Uscilla, Jennifer Sokoloski, senior project engineer of defendant, and Thomas McIntyre, the former project superintendent for defendant's consultant on the project, and documentary evidence. At the close of plaintiff's case-in-chief, defendant moved for involuntary dismissal of plaintiff's fraud and contract claims, which the court denied. At the close of the evidence, defendant moved for a directed verdict on plaintiff's fraud claim. The court denied that motion as well.

As noted, the jury returned a verdict in favor of plaintiff on the PPA, breach of contract, and fraud claims and awarded plaintiff $1,850,000 in damages. The same day, the court entered a judgment reflecting that verdict.

Three weeks later, defendant moved for judgment notwithstanding the verdict (JNOV) pursuant to Rule 4:40-2(b), for a new trial pursuant to Rule 4:49-1, and/or for a new trial on damages or for a remittitur. After hearing oral argument, the court issued an oral decision and a corresponding March 16, 2018 order in which it denied defendant's motion for a new trial and left the liability verdict undisturbed. It also denied defendant's motion for a new trial or to set aside the verdict as to the fraudulent inducement claim and upheld the punitive damages award. The court, however, reduced the amount of the jury award for plaintiff's PPA claim from $250,000 to $66,221.04.[3]

In support of its decision to deny defendant a new trial or set aside the verdict with respect to the fraud claim, the court explained that the trial evidence "established that [defendant] knew about a potential 'Proximity Act' violation as of at least August 14, 2013." Further, the court stated that the jury knew that "[plaintiff] was facing financial difficulties prior to . . . entering into the subcontract" and that Steven "stated that the project would have been bid higher" had plaintiff been aware of the latent site condition. In this regard, the court determined that "[i]t was not unreasonable for the jury to find that

---

[3] The court, on March 27, 2018, amended its March 16, 2018 orders to reflect the correct dates that the orders were signed.

knowledge of the proximity of live wires to the shielding that was to be installed by [plaintiff] was a material misrepresentation that should have been disclosed when the amount of the subcontract was negotiated . . . ."

Regarding the breach of contract claim, the court stated that sufficient evidence had been presented a trial to permit the jury to award plaintiff $800,000 in compensatory damages as "[t]hey were given the exact calculations down to . . . $751,596.91" and were informed that plaintiff was "entitled to damages resulting from [defendant]'s violation of the [PPA] as well as lost profits in any amount to be determined at trial suffered by [plaintiff]." Finally, the court determined that the jury could reasonably have concluded that defendant concealed the latent PSE&G site condition to obtain more favorable pricing for the job from plaintiff.

Plaintiff moved for attorneys' fees under the PPA and the subcontract and requested a fifty percent fee enhancement. After hearing oral arguments, the court awarded plaintiff a total of $260,911.36. That award was comprised of $220,243.50 in attorneys' fees, $18,643.51 in costs, and a ten percent enhancement equaling $22,024.35. In support of its determination, the court issued a March 29, 2019 oral decision and corresponding order. In its oral decision, the court found that "the billing in this case was appropriate," and

that it was proper to award plaintiff attorneys' fees incurred prior to the filing of the complaint because "it all seemed related to the same issue, which is . . . the shielding work that was done on this project." This appeal followed.

II.

Defendant first argues that the trial court erred in denying its motion for partial summary judgment on the fraud claim. Next, it maintains that the court erred by denying summary judgment on plaintiff's breach of contract claim because, as provided for in the subcontract, plaintiff received the monetary amount that was approved by NJDOT. Defendant also contends that summary judgment was warranted in its favor on plaintiff's PPA claim because the PPA is inapplicable when the parties have agreed to an alternative payment mechanism, such as the subcontract here which permitted defendant to withhold funds to pay plaintiff's vendors and suppliers. We first address the applicable standard of review and then each of defendant's claims in the order presented.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). "Summary judgment must be granted if 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits,

if any, show there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment . . . as a matter of law.'" Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting R. 4:46-2). We accord no special deference to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

## A.   Fraud

As noted, defendant contends in Point I.A of its merits brief that the trial court committed error when it denied defendant's motion for summary judgment on plaintiff's fraud claim. Specifically, it contends that as a matter of law, plaintiff failed to establish a prima facie claim of fraud because:  1) the subcontract required plaintiff to inspect the site, and thus any alleged fraud is not cognizable in conjunction with a contract claim; 2) plaintiff knew about the existence of the PSE&G wires but made no inquiry into a potential Proximity Act violation and could not have reasonably relied on any omission by defendant; and 3) plaintiff failed to establish that defendant owed it a duty to disclose the proximity of the PSE&G wires. We disagree.

Initially, we note that defendant's arguments in its moving brief submitted to the trial court related to the fraud claim were extremely limited. In fact, that brief contained no point heading regarding the fraud claim and

stated only, within its breach of contract analysis, that "[plaintiff]'s claim related to the PSE&G extra work rises and falls based upon the express contract language of the subcontract" and that "[plaintiff] has no right for further recovery on the PSE&G claim . . . that has [not] already been presented to the NJDOT by [defendant] and [plaintiff] and fully resolved."  Defendant did not use the word "extraneous," argue that no duty to disclose existed, nor contend that any reliance by plaintiff was unreasonable.  Even in its reply brief, which addressed plaintiff's fraud claim in more detail, defendant limited its argument to plaintiff's failure to show that "(1) [defendant] knew of any falsity, (2) that [plaintiff] itself did not know of the allegedly concealed PSE&G condition, and (3) that [plaintiff] was even damaged since the PSE&G claim was ultimately presented to the NJDOT, negotiated, and settled at the direction of [plaintiff]."

Likewise, defendant did not present these arguments in support of either motion to dismiss at trial.  On its motion at the close of plaintiff's evidence, counsel merely argued that plaintiff had not "identified a person . . . [or] a date" of the alleged fraud and that "[Steven] was aware of the PSE&G line."  Further, at the close of all of the evidence, defense counsel stressed the clear and convincing evidence standard and characterized the case as "as best . . . a

case about . . . a utility line that may or may not have impacted [plaintiff's] work" and not one of fraud. And, in its brief in support of its motion for JNOV and/or a new trial, other than a spare quotation regarding a duty to disclose from an unreported opinion, defendant again failed to put forth any of the arguments it advances on appeal. Instead, as on the prior motions, defendant's fraud argument revolved around whether it acted with intent in concealing the PSE&G wire interference, whether plaintiff knew or could have known of the condition, and whether plaintiff was actually damaged.

Defendant's generalized statements throughout the litigation did not suffice to preserve the arguments it seeks to advance on appeal, and we consider those contentions waived. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised go to the jurisdiction of the trial court or concern matters of great public interest.'"). Such arguments should be raised specifically in order to be preserved for appeal, not swept into general requests for dismissal. See United States v. Hoffecker, 50 F.3d 137, 162 (3d. Cir. 2008) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a

passel of other arguments, as [defendant]'s did." (alteration in original) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991))). For purposes of completeness, however, we address and reject defendant's contentions on the merits.

In order to establish a claim for fraudulent inducement, a plaintiff must prove a misrepresentation of material fact, knowledge of belief by the defendant of its falsity, intent that the other party rely on the misrepresentation, and reasonable reliance thereon by the other party. Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). Fraud in the inducement does not differ materially from common law fraud, as it provides a cognizable basis for equitable relief in the event a false promise induced reliance. See Lipsit v. Leonard, 64 N.J. 276 (1974). Plaintiff must prove each element by "clear and convincing evidence." Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989).

However, a plaintiff is prohibited "'from recovering in tort economic losses to which their entitlement only flows from contract.'" Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Co., 6 F.3d 604, 618 (3d Cir. 1995)). This doctrine "functions to eliminate recovery on 'a

contract claim in tort clothing.'" G&F Graphic Servs. v. Graphic Innovators, Inc., 18 F. Supp. 3d 583, 588-89 (D.N.J. 2014) (quoting SRC Constr. Corp. v. Atl. City Hous. Auth., 935 F. Supp. 2d 796, 801 (D.N.J. 2013)); see also New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 494 (App. Div. 1985) (finding that defendant's failure to use construction material specified in the parties' contract was a type of conduct "not ordinarily alleged in a tort case" and could not give rise to a separate claim by "[m]erely nominally casting [the] cause of action" as a tort claim).

While New Jersey courts have applied this doctrine in the strict liability and negligence contexts, see, e.g. Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555 (1985); Alloway v. General Marine Indus., L.P., 149 N.J. 620 (1997), "[n]o New Jersey Supreme Court case holds that a fraud claim cannot be maintained if based on the same underlying facts as a contract claim." Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 144 (3d Cir. 2001). In fact, the law on whether a plaintiff may recover for purely economic loss on concurrent fraud and contract claims has arisen predominantly out of the New Jersey federal courts and other jurisdictions, not our state courts.

Generally, "[t]he pattern that has emerged in New Jersey decisional law is that claims for fraud in the performance of a contract, as opposed to fraud in

the inducement of a contract, are not cognizable under New Jersey law." Bracco, 226 F. Supp. 2d at 564. "Courts have continued to affirm 'the conceptual distinction between a misrepresentation of statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and the subsequent failure of the promisor to do what he has promised.'" Id. at 564 (quoting LoBosco v. Kure Eng'g Ltd., 891 F. Supp. 1020, 1032 (D.N.J. 1995)). In this regard, only those pre-contractual misrepresentations that are extraneous to the parties' contract may be brought alongside a breach of contract claim. Ibid; see also G&F, 18 F. Supp. 3d at 593 (permitting common law fraud claim based on alleged pre-contractual misrepresentation which was "necessarily extraneous to the contract"); Florian Greenhouse, Inc. v. Cardinal IG Corp., 11 F. Supp. 2d 521, 528 (D.N.J. 1998) (permitting fraud claim but explaining that "the factual basis for the alleged fraud is extraneous to the contract"); Genovese v. State Farm Mut. Ins. Co., 106 A.D. 3d 866, 867 (N.Y. App. Div. 2013) (holding that the plaintiff could not maintain a fraud action alongside its breach of contract action because the fraud claim was "based on the same allegations as the breach of contract" claim); S&D Maintenance Co. v. City of New York, 169 A.D. 2d 417, 418 (N.Y. App. Div. 1991) (same).

28

Where a pre-contractual misrepresentation relates to a defendant's future intent to perform under the contract, it will be considered intrinsic to the contract, and any related fraud claims will be dismissed. RNC Sys. v. Modern Tech. Grp., Inc., 861 F. Supp. 2d 436, 451 (D.N.J. 2012); see also Wyle Inc. v. ITT Corp., 13 N.Y.S. 3d 375, 376 (N.Y. App. Div. 2015) (stating that "pleadings must allege misrepresentations of present fact, not merely misrepresentations of future intent to perform under the contract, in order to present a viable claim that is not duplicative of a breach of contract claim"); Vives v. Rodriguez, 849 F. Supp. 2d 507, 521 (E.D. Pa. 2012) (dismissing because the misrepresentations as to defendant's duties were later enshrined in the contract). Cf. Ohm NYC LLC v. Times Sq. Assoc. LLC, 96 N.Y.S. 3d 198, 199 (N.Y. App. Div. 2019) (holding that a landlord's misrepresentations as to the leased premises were "misrepresentations of a then present fact" creating a "cause of action for fraudulent inducement that is not duplicative of the breach of contract claim").

Moreover, without an "independent duty imposed by law," a fraud claim is not extraneous to the contract. Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 310 (2001); see also Int'l Minerals & Mining Corp. v. Citicorp N.A., Inc., 736 F. Supp. 587, 597 (D.N.J. 1990) ("It has . . . consistently been held that an

29

independent tort action is not cognizable where there is no duty owed to the plaintiff other than the duty arising out of the contract itself."); Galdieri v. Monsanto Co., 245 F. Supp. 2d 636, 650-51 (E.D. Pa. 2002) (granting defendant's motion for summary judgment on plaintiffs' misrepresentation claim because each alleged misrepresentation "addresse[d] a breach of duty incorporated into the parties' various agreements" and was thus "'intertwined' with plaintiff's breach of contract claim").

New Jersey courts have concluded that "[s]ilence in the face of a duty to disclose" constitutes fraud in the following circumstances: 1) "fiduciary relationships such as principal and agent or attorney and client"; 2) where either party, by entering the transaction, "'expressly reposes . . . a trust or confidence in the other . . . or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence . . . is necessarily implied'"; and 3) "contracts or transactions which in their essential nature, are 'intrinsically fiduciary,' and . . . 'necessarily call[] for perfect good faith and full disclosure.'" United Jersey Bank v. Kensey, 306 N.J. Super. 540, 551 (App. Div. 1997) (quoting Berman v. Gurwicz, 189 N.J. Super. 89, 93-94 (Ch. Div. 1981)). In the second class of transactions, "[t]he nature of the transaction is not the test," but rather "[e]ach case must depend

on its own circumstances" because "[t]he trust and confidence, and the consequent duty to disclose, . . . may be necessarily implied from [the parties'] acts and other circumstances." 3 J. Pomeroy, A Treatise on Equity Jurisprudence 553 (5th ed. 1941).

Similarly, courts do not consider fraud claims extraneous to contract claims where both claims possess "the same measure of damages." RNC Sys., 861 F. Supp. 2d at 454; see also Manas v. VMS Assocs, LLC, 863 N.Y.S.2d 4, 7-8 (N.Y. App. Div. 2008) (holding that "the fraud-based causes of action are duplicative of the breach of contract cause of action" where "plaintiff did not allege that she sustained any damages that would not be recoverable under her breach of contract cause of action"). Essentially, in order to maintain simultaneous claims in tort and contract, a defendant must "cause harm to the plaintiff distinct from those caused by the breach of contract." Pub. Serv. Ent. Grp., Inc. v. Philadelphia Elec. Co., 722 F. Supp. 184, 201 (D.N.J. 1989); see also Saltiel, 170 N.J. at 310 (holding that the failure of the defendant to apply "specific technical skills" required under a construction contract was "a breach of its contractual duties," but did not constitute a separate tort).

Applying the facts against these legal principles, we conclude that plaintiff's fraud claim was extraneous to the parties' subcontract and that the

court properly permitted the claim to survive summary judgment. The record indicates that defendant was aware of the wire interference as early as the August 14, 2013 NJDOT progress meeting. Steven signed the subcontract on September 12, 2013, and plaintiff did not discover the latent condition independently, despite a prior walk-through of the premises, until September 17, 2013.[4] At his deposition, Steven stated that had he known of the wire interference, he would have bid $1 million on the project instead of the $697,000 that plaintiff ultimately bid. Further, defendant's omission was that of a present fact, not a future intent to perform. Therefore, plaintiff's claim clearly relates to reliance on pre-contractual misrepresentations.

---

[4] While we note that defendant indicated in its reply brief in support of its partial summary judgment motion that representatives from plaintiff attended a September 5, 2013 meeting in which the parties discussed the PSE&G wire interference, the document it references was not included in the record on appeal. In any event, as the motion record also contained evidence that plaintiff was unaware of the wire interference, the issue of whether plaintiff knew of the wire interference was, at most, a disputed material fact and precluded the granting of partial summary judgment to defendant on the fraud claim. Likewise, defendant raised the same issue at the close of plaintiff's evidence, at the close of all the evidence, and at oral argument in support of its motion for JNOV or a new trial. All motions were properly denied for the same reason, as the jury heard Steven and Eberle testify that plaintiff was unaware of the wire interference. Thus, a judgment in defendant's favor was unwarranted based on the evidence adduced at trial, and we defer to the jury's verdict and its role in determining witness credibility.

Sufficient evidence in the motion record also existed for the court to conclude that defendant violated an independent duty to disclose when it failed to inform plaintiff of the PSE&G wire interference prior to entering into the subcontract. Given that the subcontract related to a potentially dangerous construction project, the circumstances indicate that it was "necessarily implied" that defendant would make plaintiff aware of a situation, such as high voltage wires in proximity to the work site, which could result in grave injury to plaintiff's employees. See United Jersey Bank, 306 N.J. Super. at 551.

Defendant's reliance on Globe Motor Car Co. v. First Fidelity Bank, 273 N.J. Super. 388, 395 (Law Div. 1993) for the proposition that "a party has 'no duty to disclose matters of which the other party has actual or constructive knowledge or as to which the information or means of acquiring information of the two parties is equal'" is misplaced. Defendant claims that because plaintiff knew that the PSE&G wires existed, "it had at least equal means of acquiring information about the potential for the wires to interfere with its work."

Defendant reads Globe Motor Car too broadly. That case involved a car dealership whose employee committed embezzlement by falsifying records. The car dealership sued a bank whose role it was to extend credit to the dealership and to "inspect Globe's records and the vehicles" as the bank saw

fit. Id. at 391. The Law Division found that the bank did not have a fiduciary duty to uncover and notify the plaintiff of its own employee's embezzlement scheme based on the parties' relationship as debtor and creditor. Id. at 394. In this regard, it noted that the bank did not possess knowledge of the embezzlement, but that the plaintiff could have simply examined the bank's monthly reports to determine whether "any deposits [were] missing or if checks [were] drawn without authority." Id. at 394-95.

Here, however, the motion record supported the reasonable inference that plaintiff had neither actual nor constructive knowledge of the wires' voltage and proximity to the platform. As Steven and Eberle both noted, plaintiff could not have identified as much during their walk-through because the platform had not yet been built. Further, unlike the bank in Globe Motor Car, defendant was in a much better position to discover and discern the voltage and proximity of the wires because it was involved the design of the platform and attended various meetings with PSE&G. As such, the parties did not have equal means of identifying the voltage and proximity of the wires.

Moreover, as discussed infra Section IV, plaintiff's claimed damages for fraud arise separately from its claimed damages for breach of contract. As noted, at Steven's deposition, he testified that he would have bid $1 million on

34

the project instead of $697,000. Those damages stem from defendant's failure to disclose the PSE&G wire interference to plaintiff before the subcontract was signed. The remainder of the evidence in the motion record regarding plaintiff's claimed damages – i.e., $66,221.04 in payments that defendant failed to disburse, $255,517 representing the difference between plaintiff's $697,000 bid and the $441,482.79 that the NJDOT approved, $126,856.66 in fees and penalties from the Department of Labor, and other costs related to billing – arise out of defendant's performance under the subcontract. As such, we conclude that defendant did "cause harm to the plaintiff distinct from those caused by the breach of contract." Pub. Serv. Ent. Grp., Inc., 722 F. Supp. at 201.

Defendant's reliance on P.T. & L. Constr. Co. v. Dep't of Transp., 108 N.J. 539 (1987) is also misplaced. Defendant contends that P.T. & L. supports the proposition that "where there is a false representation about, or actual concealment of information regarding site conditions, a contractor is entitled to compensation of extra work . . . [b]ut . . . the claim remains a breach of contract claim" and not a fraud claim.

In P.T. & L., the plaintiff construction company contracted with the State to perform site clearance, underground, and roadway work, including

"stripping" on Route 78 in Springfield.  Id. at 542.  Because of poor working conditions which led to flooding on the west end of the work site, the "stripping" took 171 days instead of the 3 days allocated.  Id. at 543.  The plaintiff contended that "the State, through the contract process, had misled it into believing that it would be working under dry or normal working conditions by use of the term 'stripping,'" ibid., and argued that "the work should have been described to bidders as 'wet excavation,'" id. at 546.  It also asserted that certain specified materials and elements of the design drawings indicated "dry conditions" of work.  Id. at 547.

The P.T. & L. Court held that "the State's nondisclosure of material facts constituted a misrepresentation of site conditions" and allowed the plaintiff to recover for breach of contract.  Id. at 541.  In doing so, it distinguished a claim based only on "implicit" representations, which would not support recovery, as opposed to "a claim founded on the State's withholding information that conditions would be wet."  Id. at 541-42.

Notably, the P.T. & L. Court did not address the propriety of a fraud claim under those circumstances at all, as the plaintiff in that case asserted only a claim for breach of contract.  While defendant argues that P.T. & L. held that "even where an owner or contractor is alleged to have misrepresented

36

site conditions . . . the damages, if any, are contract damages and depend upon the specificity of the allegedly misrepresented site conditions or specifications," our Supreme Court did not so limit a plaintiff's recourse regarding a fraud allegation. The mere fact that the P.T. & L. Court permitted a plaintiff to recover for breach of contract does not preclude plaintiff in this case from recovering under a fraud claim.

As we have concluded that plaintiff's fraudulent inducement claim is extraneous to its contract claim and that defendant had a duty to disclose the latent wire interference, the final step in the analysis is to determine whether plaintiff reasonably relied on defendant's omission. Steven certified in plaintiff's opposition to defendant's motion for partial summary judgment that at the time plaintiff submitted its bid, it was impossible for it to know of the wire interference, as the wires "[were] not identified on any of the Project plans or specifications" prepared by defendant and Safespan, and that despite a walk-through of the work site, "it was not apparent that the cables were proximate to the area where the temporary shielding would eventually be installed." Given that defendant took part in designing the platform and did not disclose the proximity of the wires and that Steven indicated his bid would have been significantly different had he been made aware of the dangerous

conditions known by defendant, we conclude sufficient evidence existed for the court to deny defendant's summary judgment motion, and for the jury to have concluded, that plaintiff reasonably relied on that omission in submitting its bid. As such, because defendant misrepresented a present fact prior to entering into the subcontract, which it had a separate duty to disclose, and plaintiff reasonably relied on that nondisclosure, we conclude the trial court properly denied summary judgment on the fraud claim.

## B. Breach of Contract

In Point II.A, defendant maintains that "the [s]ubcontract unambiguously provided that, in exchange for extra work, [plaintiff] was only entitled to as much compensation as . . . the NJDOT was willing to pay" under both Articles 6 and 7, and that the trial court misconstrued the subcontract. Defendant further asserts that the court should have found that defendant satisfied its contractual duties with respect to plaintiff's PSE&G claim at the summary judgment stage. We disagree.

At the appellate level, "[i]nterpretation and construction of a contract is a matter of law for the court subject to de novo review." Fastenberg v. Prudential Ins. Co., 309 N.J. Super. 415, 420 (App. Div. 1998). Appellate courts decide such purely legal questions without deferring to a lower court's

"interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); see also Zaman v. Felton, 219 N.J. 199, 216 (2014).

When interpreting a contract, the court should consider the plain language of the contract, the circumstances surrounding the contract, and the contract's purpose. Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 115-16 (2006). In doing so, and in determining whether a contract is ambiguous, courts may consider extrinsic evidence offered in support of conflicting interpretations. Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993). Such evidence may include the structure of the contract, the parties' bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. Ibid.

Although courts may use course of performance and course of dealing in interpreting contract terms, "express terms are given greater weight than course of performance [and] course of dealing." Restatement (Second) of Contracts § 203(b) (Am. Law. Inst. 1981). However, "where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." Karl's Sales

& Serv., Inc. v. Gimbel Bros., 249 N.J. Super. 487, 493 (App. Div. 1991). It should not "rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

Contrary to defendant's contention, plaintiff's interpretation is supported by the clear language of Exhibit A and the Rider to Exhibit A, which specifically modify or supersede the terms of the subcontract. In this regard, the Rider to Exhibit A states that plaintiff was entitled to "full compensation for all work performed including [c]hange [o]rder work as long as work is acceptable to [defendant] and [NJDOT]. Such compensation shall not be unreasonably withheld and shall be given in a timely manner." Both Article 6 and Exhibit A define "full compensation" as time and material costs plus allowable markup. The record indicates that even considering the additional unexpected change order work, plaintiff completed its work within the original timeframe contemplated by the parties under the subcontract and there is no indication in the record that either defendant or NJDOT deemed plaintiff's work unacceptable. Moreover, it is undisputed that plaintiff did not receive full compensation for its change order work.

Further, a genuine issue of material fact existed as to whether compensation to plaintiff was, as proscribed by the Rider to Exhibit A, "unreasonably withheld and . . . given in a timely manner." Indeed, as noted, neither party disputes that plaintiff has yet to receive the full amount to which defendant alleges plaintiff is entitled. As such, summary judgment for defendant would have been improper on plaintiff's contract claim as well.

## C. Prompt Payment Act

In Point III, defendant argues that the trial court erred in denying summary judgment on plaintiff's PPA claim. Specifically, it asserts that "[b]ecause the summary judgment record undisputedly established that [plaintiff] had failed to timely pay its vendors and suppliers, there was no genuine issue of material fact as to whether the [s]ubcontract entitled [defendant] to withhold payment from [plaintiff]." In this regard, defendant maintains that the subcontract entitled it "to withhold funds in order 'to assure payment of [plaintiff]'s unpaid obligations.'" In opposition, plaintiff correctly notes that defendant did not move for summary judgment on that claim in the trial court.

We reject defendant's argument that it was entitled to summary judgment on the PPA claim, as it never moved for summary judgment below on that

claim. "[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder, 62 N.J. at 234. As defendant's summary judgment claim fulfills neither of those conditions, we decline to address its argument in the context of whether defendant was entitled to summary judgment.

However, we note that by raising the issue in opposition to plaintiff's motion for partial summary judgment, defendant properly preserved the argument that the PPA is subordinate to the parties' subcontract and address that argument on the merits. See Nat'l Westminster Bank N.J. v. Anders Eng'g, Inc., 289 N.J. Super. 602, 609-610 (App. Div. 1996) (finding defendant sufficiently preserved a defense for appellate review where that defense was raised in its trial level opposition brief). As such, we conclude that insufficient evidence supported a jury verdict on the PPA and reverse that portion of the verdict.

N.J.S.A. 2A:30A-2(b) provides that where a subcontractor "has performed in accordance with the provisions" of a subcontract, the prime contractor has accepted the work, and "the parties have not otherwise agreed in

writing, . . . the prime contractor shall pay to its subcontractor . . . within [ten] calendar days of the receipt of each . . . payment . . . the full amount received for the work of the subcontractor . . . based on the work completed or the services rendered . . . ." (emphasis added). Where "a payment due pursuant to . . . this section is not made in a timely manner, the delinquent party shall be liable for the amount of money owed under the contract, plus interest at a rate equal to the prime rate plus 1%." N.J.S.A. 2A:30A-2(c).

Here, the subcontract permits defendant to withhold funds from plaintiff "to ensure payment of [plaintiff]'s obligations," such as the unions and vendors. The trial court noted as much in denying plaintiff's motion for summary judgment, stating that defendant "argue[d] that the withholding of the funds was necessary in order to pay those vendors." As such, based on a plain reading of the statute, the parties "otherwise agreed in writing" on the conditions by which defendant would disburse payments to plaintiff. Plaintiff does not dispute that it owed payments to its vendors and unions. Therefore, defendant's failure to disburse funds to plaintiff was governed by the subcontract and not the PPA, and there was insufficient evidence to support a jury verdict for plaintiff under the statute.

A-3571-17T2

## III.

In Point II.B, defendant argues that the trial court erred in denying its motions for involuntary dismissal of plaintiff's contract claim at the close of plaintiff's evidence, as well as its motion for judgment notwithstanding the verdict and/or for a new trial on the contract claim. Specifically, it contends that the breach of contract claim should not have been submitted to the jury because plaintiff "failed to show that [defendant] did anything other than fully comply with its obligations under the [s]ubcontract." According to defendant, "[a]t trial, the evidence unequivocally showed that [defendant] paid [plaintiff] all amounts required under the [s]ubcontract." Defendant also contends the trial court erred "by deeming the [s]ubcontract ambiguous and permitting parol evidence to 'interpret' it." We disagree.

A motion for judgment may be made at the close of plaintiff's case, <u>Rule</u> 4:37-2(b) or after the verdict, <u>Rule</u> 4:40-2(b). Both motions are governed by the same evidential standard: "[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according [it] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied . . . ." <u>Verdicchio v. Ricca</u>, 179 N.J. 1, 30 (2004) (quoting <u>Estate of Roach v.</u>

TRW, Inc., 164 N.J. 598, 612 (2000)); see also ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014). We apply the same standard on appeal. Estate of Roach, 164 N.J. at 612.

Moreover, Rule 4:49-1(a) provides that a trial court shall grant a new trial if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." A "miscarriage of justice" is defined as a "pervading sense of 'wrongness'" that stems from a "manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result." Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 521 (2011) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)). "[T]he standard for authorizing a new trial . . . requires a determination that the jury's verdict is 'contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice, or partiality.'" Crawn v. Crampo, 136 N.J. 494, 512 (1994) (quoting Lanzet v. Greenberg, 126 N.J. 168, 175 (1991)).

As noted, the clear and unambiguous language of Exhibit A and its accompanying Rider establishes that plaintiff was entitled to "full compensation for all work performed including [c]hange [o]rder work," which

it did not receive. In this regard, the jury heard Ellen testify that she did not sign the change order form and that plaintiff "did not accept the sum of $441,482.79 in full satisfaction of its claim against [defendant]."[5] Further, Ellen testified that when she sent the e-mail authorizing defendant to settle plaintiff's claim with NJDOT, her decision was spurred by "a phone call from . . . Antoun threatening that if she did not send the e-mail, [plaintiff] would get nothing." Ellen also stated that plaintiff received no payment. As such, questions of fact existed as to whether defendant fully discharged its contractual duties, and denial of defendant's motions for involuntary dismissal and JNOV was proper. And, based on the evidence adduced at trial, it does not clearly and convincingly appear that there was a miscarriage of justice under the law warranting a new trial. R. 4:49-1(a); see also Barber, 406 N.J. Super. at 51.

---

[5] Although plaintiff accuses defendant of attempting to resurrect its accord and satisfaction defense on appeal, we note that defendant makes clear in its reply brief that "this [is not] a matter of 'accord and satisfaction,' . . . it is simply a matter of [defendant] having fully performed its obligations under the Subcontract."

IV.

Defendant asserts in Point IV that the jury's compensatory damages award was excessive, and therefore, the trial court erred in denying its motion for a new trial on damages or for a remittitur. Specifically, it contends that based on the evidence presented at trial, the jury's award on plaintiff's breach of contract claim could not have exceeded $382,373.87.[6] In this regard, it argues that the jury's $800,000 award on plaintiff's contract claim "could only have resulted from double-counting" the PPA and fraud damages in calculating the damages award. It further avers that the trial court erred by justifying the damages award based on plaintiff's "vague statement" in its responses to interrogatories that it suffered lost profits. We disagree.

The award of damages is left to the sound discretion of the trier of fact. Mandia v. Applegate, 310 N.J. Super. 435, 446 (App. Div. 1998). An appellate court should not disturb the amount of damages awarded unless the

---

[6] Defendant also claims that plaintiff stipulated and explained to the jury that it would be limited to "the amount of damages . . . explained on page [five] of [plaintiff's] interrogatories," which totaled $751,594.91. Nevertheless, "a jury is free to reject any evidence, including that which is uncontroverted," including any stipulation plaintiff may have made. State v. Wesner, 372 N.J. Super. 489, 494 (App. Div. 2004); see also AGS Computs., Inc. v. Bear, Stearns & Co., 244 N.J. Super. 1, 5 (App. Div. 1990); Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4(a) on N.J.R.E. 101(a)(4) (2020).

award is plainly wrong, constitutes a manifest injustice, or shocks the court's conscience. Carey v. Lovett, 132 N.J. 44, 66 (1993). Thus, if the record supports "a reasonable estimate of damages, based upon more than mere speculation, a damage award can be affirmed." Fort Lee v. Banque Nat'l De Paris, 311 N.J. Super. 280, 291 (App. Div. 1998). Moreover, a damage award should be affirmed if evidence is adduced "which affords a basis for estimating damages with some reasonable degree of certainty." Viviano v. CBS, Inc., 251 N.J. Super. 113, 129 (App. Div. 1991).

The purpose of compensatory damages is to compensate the plaintiff for his or her actual loss. Nappe, 97 N.J. at 48. "It is well-settled that the 'law abhors damages based on mere speculation.'" Mosley v. Femina Fashions, Inc., 356 N.J. Super. 118, 128 (App. Div. 2002) (quoting Caldwell v. Haynes, 136 N.J. 422, 442 (1994)). However, "[w]here a wrong has been committed, and it is certain that damages have resulted, mere uncertainty as to the amount will not preclude recovery – courts will fashion a remedy even though the proof on damages is inexact." Kozlowski v. Kozlowski, 80 N.J. 378, 388 (1979). A plaintiff is only required to "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the

trier of the facts to make a fair and reasonable estimate." Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987).

"[I]t is fundamental that no matter under what theories liability may be established, there cannot be any duplication of damages." Ptaszynski v. Atl. Health Sys., Inc., 440 N.J. Super. 24, 39-40 (App. Div. 2015) (quoting P. v. Portadin, 179 N.J. Super. 465, 472 (App. Div. 1981)). Thus, courts have consistently precluded recovery of duplicative damages predicated on the same injuries. See, e.g., Battaglia v. United Parcel Serv. Inc., 214 N.J. 518, 562 (2013) (holding that where a jury awarded a plaintiff damages under the Law Against Discrimination, the plaintiff could not recover on his implied contract claim because any recovery "would be entirely co-extensive with the verdict [he] has already received"); Ptaszynski, 440 N.J. Super. at 40 (holding that the trial judge erred in not instructing the jury "that it could not award plaintiff damages for defendant's violations of [a statute] and its negligence based upon the same injuries or harm to [plaintiff]").

Here, the jury's $800,000 award of compensatory damages on the breach of contract verdict is supported by the record without double counting the fraud damages. Initially, defendant concedes that Ellen testified at trial to the following damages claims relating to breach of contract: 1) $255,517.21,

which represented the difference between plaintiff's $697,000 proposal for the balance of the PSE&G work and the $441,482.79 that NJDOT approved; 2) $66,221.04 for the unpaid balance of that $441,482.79; and 3) $126,856.66, which represented fees and penalties imposed by the Department of Labor. The total amount of those damages was $448,594.91.[7]

Other evidence adduced at trial further supports the jury's $800,000 award on defendant's breach of contract. For example, while we recognize that Ellen was subject to robust cross-examination, she testified and plaintiff presented documentary evidence regarding its incurred damages with respect to the center platform in the amount of $246,408.97.[8] In addition, the jury

---

[7] Defendant concedes that the $66,221.04 was "expressly included in the elements of [plaintiff]'s contract damages . . . at trial," but argues that since the trial court modified the jury's PPA verdict to represent that sum, it cannot be applied to the breach of contract damages. After subtracting that number from the $448,594.91 amount, defendant contends that plaintiff's award of compensatory damages for breach of contract cannot exceed $382,373.87. However, as we reverse the PPA verdict, we conclude that the $66,221.04 was a proper consideration for damages under the breach of contract claim and was consistent with the jury charge on breach of contract which said that plaintiff was to be placed "in as good a monetary position as he or she would have enjoyed if the contract had been performed as promised."

[8] At trial, Ellen testified that plaintiff completed 48,000 square feet of work on the center platform at the $6.60 per square foot contract price, for a total of $316,000 value under the contract. However, she stated that "the cost to complete the center section of the platform" ended up totaling $563,208.97. In

50

heard testimony that defendant improperly deducted $50,566.56 from plaintiff's time and material billing "for equipment costs directly incurred by [plaintiff]." Combining defendant's admitted damages with the additional evidence adduced at trial equals $745,570.44.[9] Thus, the record supports "a reasonable estimate of damages, based upon more than mere speculation," Fort Lee, 311 N.J. Super. at 291, and we accordingly affirm as to the jury's compensatory damages award for breach of contract.

With respect to the fraud damages, there was also evidence presented at trial to support the jury's award without it having double-counted damages. For example, Steven testified that had he known of the wire interference prior to entering his bid, he would have bid using a 20% to 25% profit margin and a 25% overhead margin, not the allowable 10% markup for profit and 15% markup for overhead as provided for change or extra work in the subcontract.

its merits brief, plaintiff explains that the jury could reasonably have determined that defendant's breach led to plaintiff's loss of the difference between these two values, $246,408.97.

[9] We note that in plaintiff's merits brief, it also maintains that the damages award for breach of contract could be supported in part by the $121,000 difference between the $818,000 claim on the change order submitted by defendant to NJDOT "for the value of [plaintiff]'s work, which [defendant] admitted was a valid claim supported by documentary evidence," and the $697,000 amount which was eventually claimed by plaintiff.

Moreover, he testified the time and material amounts he provided in conjunction with the change order work did not include salary for Ellen or himself, and that would have been included in a bid. In this regard, Steven testified that had defendant not concealed the PSE&G wire interference, plaintiff's bid on the project would have been $1 million as opposed to $697,000. Thus, the $303,000 difference provided a permissible basis for the jury to arrive at a $300,000 award for fraud without double counting that amount in the $800,000 contract damages award.

V.

Defendant further argues, in Point V, that the trial court erred by failing to vacate the $500,000 punitive damages award.[10] Defendant maintains that plaintiff was not entitled to punitive damages because it "did not present any evidence that [defendant] acted with 'actual malice' or 'wanton and willful disregard'" pursuant to the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.12. We disagree.

---

[10] We note that defendant does not challenge the quantum of the punitive damages award on appeal, merely the fact that the jury awarded punitive damages. As such, we do not address the propriety of the amount of damages awarded.

We review the trial court's decision to award punitive damages for an abuse of discretion. Maudsley v. State, 357 N.J. Super. 560, 590 (App. Div. 2003). An abuse of discretion can be shown "if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error of judgment." Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002).

A court may award punitive damages "as punishment or deterrence for particularly egregious conduct." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984); see also Maudsley, 357 N.J. Super. at 590. To impose punitive damages, "a defendant's conduct must be willfully and wantonly reckless or malicious." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997). Punitive damages require "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." Smith v. Whitaker, 160 N.J. 221, 241 (1999) (quoting Nappe, 97 N.J. at 49). A plaintiff "must prove by clear and convincing evidence a 'deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences.'" Id. at 242 (quoting Berg v. Reaction Motors Div., Thiokol Chem Corp., 37 N.J. 396 (1962)).

Further, juries are permitted to award punitive damages in cases which include causes of action in addition to fraud. See, e.g., Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 70-71 (App. Div. 1997) (upholding punitive damages award where a jury found defendants liable for fraud, breach of contract, conversion, and tortious interference); Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co., 226 N.J. Super. 200, 227 (App. Div. 2000) (reversing dismissal of fraud and punitive damages claims where the only jury verdict was on breach of warranty and noting that while punitive damages "would not generally be awardable on a warranty theory of liability, . . . if defendants' conduct is found to be fraudulent" on remand, "the imposition of punitive damages might be warranted").

As discussed, the jury did not err in finding that defendant committed fraud as there was substantial evidence that defendant failed to disclose the PSE&G wire interference to induce plaintiff to enter the contract. Further, there was sufficient evidence adduced at trial to establish that defendant acted with a "conscious and deliberate disregard of the interests of others." As the court noted when it denied defendant's motion for a new trial or a remittitur, the trial evidence supports the conclusion that defendant knew of a potential Proximity Act violation prior to the signing of the subcontract but did not

54

disclose that information to plaintiff because it knew that it "was obtaining a better price" in contract negotiations. Defendant's conduct induced plaintiff to engage in a potentially life-threatening activity while also depriving plaintiff of the opportunity to negotiate the fair value for the work required to complete the project. In this regard, defendant's conduct demonstrated a "wanton and willful disregard" of plaintiff's rights.

Moreover, according to Grant, who negotiated the subcontract on behalf of defendant, defendant was aware that plaintiff was facing financial difficulties at the time it executed the subcontract. Defendant nevertheless failed to pay plaintiff for the work it performed on the project, instead taking the position that plaintiff knew or should have known of the proximity of the PSE&G wires and the attendant financial and work-related consequences on the project. Defendant refused to make timely progress payments even despite plaintiff's notifications that it needed to pay its vendors, suppliers, and unions. Indeed, in April 2015, defendant was directly notified by the New Jersey Department of Labor that plaintiff was facing prosecution, fines, and/or penalties for failing to pay union benefits. Defendant did not pay the unions until October 2015 and January 2016, after plaintiff was debarred from public

contracts. Based on that evidence, the court did not abuse its discretion in denying a new trial on punitive damages.

VI.

Defendant maintains that plaintiff should not have received attorneys' fees as it should not have been considered a prevailing party. It argues, however, that even were we to uphold the jury verdicts on all of the claims on which plaintiff prevailed below, plaintiff would not be entitled to attorneys' fees on the fraud claim. Further, defendant contends that "unless the PPA verdict is upheld, [plaintiff] is not, as a matter of law, entitled to an enhancement of the lodestar amount." Based on our reversal of the jury's PPA verdict, we vacate and remand for the trial court to determine whether attorneys' fees and an attendant fee enhancement are warranted.

"[F]ee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J. 292, 317 (1995). We award attorneys' fees only where "expressly provided for by statute, court rule, or contract." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 385 (2009) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001)).

"The starting point in awarding attorneys' fees is the determination of the 'lodestar,' which equals the 'number of hours reasonably expended multiplied by a reasonable hourly rate.'" Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004) (quoting Rendine, 141 N.J. at 335). "In determining the reasonableness of a fee, the factors in RPC 1.5(a) must be considered." Stoney v. Maple Shade Twp., 426 N.J. Super. 297, 318 (App. Div. 2012) (citing Furst, 182 N.J. at 22).

"In cases where plaintiff presents 'distinctly different claims for relief' in one lawsuit, work on those unrelated claims cannot be deemed in pursuit of the ultimate result achieved." Silva v. Autos of Amboy, Inc., 267 N.J. Super. 546, 556 (App. Div. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434-35 (1983)). However, "when the plaintiff's claims for relief 'involve a common core of facts or will be based on related legal theories,' such a suit cannot be viewed as a series of discrete claims." Ibid. (quoting Hensley, 461 U.S. at 435).

"[I]f a plaintiff's unsuccessful claims are related to the successful claims, either by a 'common core of facts' or 'related legal theories,' the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated."

Singer v. State, 95 N.J. 487, 500 (1984) (quoting Hensley, 461 U.S. at 435). Therefore, "[i]f the results obtained are fully effective in vindicating plaintiff's rights, counsel should recover for all hours reasonably expended on the litigation." Ibid. On the other hand, "if a successful plaintiff has achieved only limited relief in comparison to all of the relief sought, the court must determine whether the expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained, . . . and, if not, reduce the award proportionately." Ibid. However, "there need not be proportionality between the damages recovered and the attorney-fee award itself." Furst, 182 N.J. at 23 (citing Rendine, 141 N.J. at 336).

After determining the lodestar, the court must consider whether an enhancement is appropriate "to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." Rendine, 141 N.J. at 337. This determination hinges on "the actual risks or burdens that are borne by the lawyer or lawyers." Id. at 339-40 (quoting Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711, 747 (1987) (Blackmun, J., dissenting)). An enhancement may not be appropriate under certain circumstances, such as where an attorney is paid a portion of his or her hourly fee regardless of results; where the damages

sought are so substantial that the contingent fee could exceed the lodestar amount; or where "the likelihood of success is unusually strong." Id. at 340-41; see also Litton, 200 N.J. at 389 ("Unlike the traditional fee-shifting case in which enhancement has some relevancy as a type of encouragement to represent a party . . . the opposite applies in a contract case.").

Here, it is undisputed that the subcontract entitled plaintiff to attorneys' fees. The parties provided, under paragraph 21 of the Rider to Exhibit A, that Article 25 of the subcontract would be revised to state "that the losing party shall be responsible for all costs, disbursements, and expenses[,] including reasonable attorney fees incurred by the prevailing party as a result of any claim or dispute between [plaintiff] and [defendant] if so directed by the arbitrator or the court."

In awarding a $220,243.50 lodestar amount, however, the trial court necessarily considered plaintiff's counsel's work on obtaining the PPA verdict. As we reverse as to that claim, we vacate and remand the trial court's March 29, 2018 order granting plaintiff's application for attorneys' fees, as well as the portion of that order granting a fee enhancement to plaintiff. While the trial court stated that based on its review, plaintiff's billing "all seemed related to the same issue, which is the contract issue, the shielding work that was done

on this project," we note that as its review inherently included work on the PPA claim, the court should reconsider that conclusion on remand. In this regard, the court should determine the degree to which "plaintiff's unsuccessful claims are related to the successful claims, either by a 'common core of facts' or 'related legal theories,'" Singer, 95 N.J. at 500 (quoting Hensley, 461 U.S. at 435), and recalculate any fee award and attendant enhancement pursuant to the aforementioned principles.

## VII.

In sum, we affirm the trial court's December 15, 2017 order denying summary judgment, its March 16, 2018 order denying defendant's motion for JNOV or a new trial, and the jury's January 25, 2018 verdict only to the extent that they relate to plaintiff's breach of contract and fraud claims and the jury's attendant $800,000 compensatory damages award for breach of contract and $300,000 award for fraud. We reverse, however, the jury's verdict that defendant violated the PPA. We also affirm the jury's $500,000 punitive damages award. Finally, we vacate and remand the court's March 29, 2018 order granting plaintiff's application for attorneys' fees and a fee enhancement and remand for further proceedings to determine whether plaintiff is entitled to a fee award.

A-3571-17T2

We stress that this verdict and the attendant damages award were the result of a jury trial. The jury considered a wealth of evidence and we necessarily defer to their findings. See Cuevas v. Wentworth Grp., 226 N.J. 480, 499 (2016) ("A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'") (quoting Baxter v. Fairmont Food Corp., 74 N.J. 588, 598 (1977)).

To the extent we have not addressed any of defendant's arguments it is because we have concluded they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION